Willie Albert SMITH,
Petitioner–Appellant,

v.

Lee Roy BLACK, Commissioner, Mississippi Department of Corrections, et al., Respondents–Appellees.

No. 88–4790.

United States Court of Appeals,
Fifth Circuit.

June 26, 1990.

Rehearing and Rehearing En Banc
Denied Aug. 24, 1990.

Robert J. Brantley, Jr., Kenneth J. Rose, Jackson, Miss., David E. Massengill, John J. Kenney, Simpson, Thacher & Bartlett, New York City, for petitioner-appellant.

Marvin L. White, Jr., Asst. Atty. Gen., Mike Moore, Atty. Gen., Jackson, Miss., for respondents-appellees.

Before POLITZ, KING, and SMITH, Circuit Judges.

KING, Circuit Judge:

Willie Albert Smith appeals the district court's denial of his petition for a writ of habeas corpus from the judgment of conviction and death sentence entered against him on July 30, 1981, in the Circuit Court of the First Judicial Circuit of Hinds County, Mississippi. Smith was convicted of the murder of a convenience store clerk during the course of a robbery and was sentenced to death. Smith's conviction rests upon the eyewitness testimony of two men who claimed to have seen Smith abducting the clerk and upon circumstantial evidence which the Supreme Court of Mississippi fairly described as "overwhelming."

*Smith v. State,* 492 So.2d 260, 267 (Miss. 1986).

Among the many claims asserted by Smith in his petition for habeas relief are four that are particularly troubling. The first two relate to the testimony of the eyewitnesses to the abduction. The Mississippi Supreme Court found, by clear and convincing evidence, that the witnesses had perjured themselves at trial in identifying Smith as the assailant, *id.* at 261, 264, and Smith claims that his conviction based on their testimony violates the due process clause of the fourteenth amendment. Smith argues further that his ability to impeach the two eyewitnesses at trial was fatally impaired by the prosecution's failure to disclose police reports containing contemporaneous disavowals by the witnesses of their ability to identify the assailant. Third, Smith argues that his sentence rests in part on evidence of rape properly excluded at the guilt phase but admitted at sentencing, and that this evidence, combined with the prosecution's repeated allegation in closing arguments that Smith raped the murder victim, violated his right to due process under the fourteenth amendment. Finally, Smith argues that his sentence was based in part on an aggravating circumstance, that the murder was "especially heinous, atrocious or cruel," which was unconstitutional at the time his conviction became final. For the reasons set forth below, we affirm the judgment of the district court denying habeas relief based on these claims and on a host of other claims that Smith raises with respect to his conviction and sentence.

I.

The nature of Smith's claims requires a detailed understanding of the crime, the trial, and the post-trial proceedings. Shirley Roberts, the manager of a convenience store in Jackson, Mississippi, was robbed, abducted, and murdered after she attempted to open the store for business shortly after 5 a.m. one Sunday morning. About 5:30 a.m. Sgt. Oatis of the Jackson Police Department stopped in the convenience store parking lot to use a public phone, and

was there approached by two men, Kenneth Thomas and James Wells, who asked him if there had been a robbery, explaining that they had a few minutes earlier seen a black man forcing a white woman into a red Pinto. Oatis noticed that the chain used to secure the store door was lying on the pavement in front of the door, and that nearby lay a $20 bill, a set of car keys, and a silver-colored pair of brass knuckles. On the parking lot next to Oatis' patrol car lay a woman's tennis shoe and a pair of eyeglasses with a silver neck chain. Oatis radioed an alarm at 5:40 a.m., and the police rapidly determined that Roberts had been scheduled to open the store that morning and that a car remaining in the lot had belonged to her.

At 6:00 a.m., while Oatis remained in the parking lot, the defendant Smith approached the store driving a red Pinto, but reversed direction by making a U-turn after he noticed the police cars parked there. Oatis observed this maneuver and pursued and stopped Smith. Seeing Smith reach under the right-hand seat of the car, and suspecting a weapon, Oatis looked through the car window and noticed a half-protruding woman's shoe that appeared to be the exact mate of the shoe found in the parking lot. Oatis arrested Smith, and while handcuffing him noticed that one of his hands was stained with blood. A jailor subsequently removed a one-hundred dollar bill from the pants Smith was wearing when arrested. At the time of arrest, Smith denied knowing anything about the woman and refused to discuss the shoe, but agreed to lead the police to Charles Mac-Donald, the man whose car he had borrowed.

The police were led to MacDonald's room by his mother, where they awoke him from a deep sleep. He explained that Smith had borrowed the car from him at 4:30 that morning after they had returned from a party. The police satisfied themselves that MacDonald was not a likely suspect for the crime, and he led them to Smith's apartment. It was unlocked, and the police entered, fearing for the safety of Roberts. They found her purse and a woman's white sweater on Smith's bed, and on the floor found a lock and key, muddy dress shoes, and a pair of khaki pants stained with mud and blood. In the pants was a one-hundred dollar bill. Mud and leaves were on the floor by the back door and in the kitchen. About fifteen feet behind the apartment house the police found the beginning of a drag trail, which led after approximately fifty yards to a small drainage ditch from which a human ankle protruded. The victim's body lay face down in the water, covered by leaves and sticks.

## A. *Guilt Phase*

During opening statements, the prosecution made no reference to eyewitness testimony. Smith's trial counsel conceded that the state possessed "awesome" circumstantial evidence, but emphasized several times that he expected no eyewitness testimony, and that if Thomas testified as an eyewitness he would have to "have changed his story," since he had been unable to identify Smith at a lineup held before trial. Thomas was in fact the first witness called by the state. Thomas testified that he had observed the victim's abduction from approximately thirty feet away while traveling past the convenience store in a car driven by Wells, and that he had been seated on the side of the car closest to the parking lot. He described the sequence of events and the perpetrator's car, a red Pinto, in some detail. Thomas also testified that although he had been initially reluctant to cooperate with the police, he had identified Smith in a lineup conducted by the police the day after the trial. He also testified that he had identified Smith's photograph after viewing five photographs the day before trial, and identified Smith in the courtroom.

On cross-examination, Thomas re-acknowledged that he was on probation from an armed robbery conviction, and admitted or clarified that he had not identified Smith at the police lineup, that he had told relatives of Smith that he could not identify the man he saw in the parking lot, that he had seen Smith before the day of trial at the suppression hearing, and that the red Pinto had been pointed out to him before trial

while it was parked in a police impoundment lot. He explained that he had previously lied in saying that he could not identify Smith because of pressure he had received from his mother and other relatives, and further described the characteristics of the man he saw the morning of the crime.

Wells testified to substantially the same identification of the perpetrator and the car, though he claimed to see the abduction from approximately ten feet away. On cross-examination, Wells admitted that he could not identify the perpetrator at the time of the incident and had so informed Thomas, that he had told Smith's counsel and several of Smith's relatives that he could not identify the man he saw abduct the victim, that the photographic lineup conducted the day before trial was the first time he had identified Smith to anyone, that he had been told that someone resembling Smith would be in the courtroom, that Smith was easily identifiable in court as the only black sitting with a lawyer and as the only man in a blue jumpsuit, and admitted that he could not identify Smith as the man who had put the victim into the red Pinto. On re-direct, Wells indicated that he had identified Smith at his first opportunity, namely, the photographic lineup the day before trial.

The state also called as a witness a forensic pathologist, who testified that the victim had been manually strangled to death and that her body bore numerous scratches, abrasions, and bruises, and that her head bore two wounds made by two blows with a blunt instrument. MacDonald testified that Smith had shown him a pair of brass knuckles similar to those found in the parking lot on the evening before the crime was committed and that he had seemed to indicate their presence at the party, and that Smith had not indicated that he had any money that night. Two witnesses testified that the victim had at least one one-hundred dollar bill in her purse during the weekend of the crime, one additionally identifying the keys found in Smith's apartment as the store keys issued to Roberts and the other, the victim's daughter, identifying as her mother's the purse, sweater, and tennis shoes found in

Smith's possession or apartment that morning. A serologist testified that swabbings taken from Smith's hand tested positive for human blood but that the blood was too insubstantial to be typed. She also testified, however, that the blood on the khaki pants could have come from the victim and could not have come from Smith, and that the characteristics shared by the victim's blood and that blood could be expected to occur in the blood of less than 0.3% of the general population. A forensic scientist specializing in hair and fiber identification testified to the similarity of several hairs taken from Smith's bed covers and hairs taken from the victim's head, testified that several pubic hairs taken from the bed and the sweater were Caucasian and matched the victim, and that one Negroid pubic hair taken from the pubic hair of the victim was similar to hairs taken from Smith. Officer Oatis and other members of the police department testified to the sequence of events on the morning of the crime and to the inspection of the red Pinto and Smith's apartment.

Smith was the only witness for the defense, and he presented an elaborate alibi. Smith testified that after returning from the party in MacDonald's car he was startled to find the lights on in his apartment and the radio playing, and that he had feared that someone was in his apartment. After knocking and receiving no response, he changed into a pair of pants, a shirt, and some shoes that were left outside his apartment, then passed out on the porch, probably because someone had drugged him at the party. He awoke to see a shadow, tall and with a large Afro, on the right side of his house, and then left the apartment driving the Pinto. He explained that he had attempted to avoid the police in the convenience store parking lot because he was ferrying marijuana to a friend and because his driver's licence was expired, and claimed that Oatis planted the shoe in his car. He acknowledged that the muddy pants and shoes were his, though he professed ignorance as to the cause of their condition, claimed that the two one-hundred dollar bills were his, and that he owned a

pair of brass knuckles but had left them on his bed before attending the party. Smith denied having been to the convenience store before.

The state subsequently presented as a witness a clerk at the convenience store who had seen Smith in the store on several occasions, including once two days before the crime. Another witness testified that Smith had previously been arrested for disorderly conduct and resisting arrest, but admitted on cross-examination that the arrest record might indicate that a different person, with a different social security number, had been arrested. The prosecution's closing emphasized both the eyewitness and circumstantial evidence, while the defendant and his counsel professed innocence and ignorance of the crime. Defense counsel also attacked the credibility of Thomas and Wells, noted the unexpectedness of their testimony, and confessed that he had made a tactical error in allowing three persons who interviewed Thomas on behalf of Smith to remain in the courtroom during Thomas' testimony, thereby disabling them from testifying as to his previous statements, but noted that Thomas had admitted at trial his failure to identify Smith during the interview.

After deliberating for approximately one hour, Smith was convicted of the murder of Shirley Roberts during the course of a robbery, a capital crime in violation of Miss. Code Ann. § 97–3–19(2)(e) (1972 & Supp. 1989).

### B. *Sentencing Phase*

During its case at the sentencing phase the state recalled the pathologist, who testified that the victim's vagina showed signs of recent sexual intercourse, and testified that a victim of manual strangulation would remain conscious for the first one or two minutes and that death would take approximately five minutes. The state also recalled the serologist, who testified, over defense objection, that she had found numerous sperm cells in the vaginal washings of the victim; she admitted on cross-examination and re-cross examination that she could not identify any relationship between

the sperm cells and the defendant. Smith presented six witnesses, including himself, in mitigation. The other witnesses, all relatives, essentially suggested that he was innocent and that his prior violent acts were not indicative of his character. Smith testified that he went to trial because he was innocent.

In its initial closing argument, the state concentrated on rebutting Smith's mitigating evidence, but also projected slides showing the victim and alleged that Smith "sexually abused" Roberts. Defense counsel in turn stressed that Smith had been consistent in maintaining his innocence and appealed to the Christian mercy of the jurors. In explaining his own conduct and his client's wish to stand trial, he admitted that the circumstantial evidence was "overwhelming." In its second closing argument, the prosecution dwelled on the circumstances of the crime, repeatedly alleging that Smith had killed, robbed, kidnapped, and raped Roberts. The jury found three aggravating circumstances: that the murder was committed while Smith was engaged in the commission of robbery, that the murder was committed for pecuniary gain, and that the murder was especially heinous, atrocious, or cruel, and found beyond reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. Miss.Code Ann. § 99–19–101 (1972 & Supp.1989).

### C. *Post-trial Proceedings*

Smith filed a motion for a new trial claiming some fifteen grounds for relief, and upon that motion's denial filed his automatic appeal to the Mississippi Supreme Court, which then affirmed his conviction and sentence in August 1982. Smith filed a petition for rehearing, and although the Mississippi Supreme Court modified its prior opinion it affirmed the conviction and sentence. *Smith v. State,* 419 So.2d 563 (Miss.1982). Represented by new counsel, Smith filed an unsuccessful petition for writ of certiorari with the United States Supreme Court, arguing ineffectiveness of trial counsel and unlawful seizure of evi-

dence. *Smith v. Mississippi*, 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983).

Smith's subsequent petition for writ of error coram nobis was denied by the Mississippi Supreme Court, almost solely on the bases of procedural bars, and Smith's petition for rehearing was denied shortly thereafter. *Smith v. State*, 434 So.2d 212 (1983). Smith filed a petition for writ of habeas corpus in this court, which entered a stay of execution and a stay of proceedings in the district court until state court remedies were exhausted. Smith then filed a second application in the Mississippi Supreme Court on the basis that the two eyewitnesses had perjured themselves at trial. The application was successful, and the court ordered an evidentiary hearing in circuit court on the issue. *In re Smith*, 457 So.2d 911 (Miss.1984). After holding the hearing the circuit court denied relief, and on appeal the Mississippi Supreme Court affirmed and denied a petition for rehearing. *Smith v. State*, 492 So.2d 260 (Miss.1986).

While the second state post-conviction petition was pending Smith filed a third motion in state court, seeking collateral relief under Miss.Code Ann. § 99–39–1 *et seq.* (1972 & Supp.1989) on the grounds that the prosecutor had unconstitutionally excluded blacks from the jury and that the prosecution had failed to disclose certain evidence. The Mississippi Supreme Court denied the motion and denied rehearing. *Smith v. State*, 500 So.2d 973 (Miss.1986).

After entertaining an amended petition and memorandum and response, the federal district court below denied habeas corpus relief to Smith, later denying as well a motion to alter or amend the judgment. *Smith v. Thigpen*, 689 F.Supp. 644 (S.D. Miss.1988). It is this judgment which is presently on appeal.

The nature of the evidence against Smith and his grounds for seeking relief from the conviction and sentence are more fully described below. To summarize, Smith argues that the eyewitness testimony was perjured, that the state failed to disclose important impeachment evidence, that the state's use of an allegation of rape at the sentencing phase denied Smith due process, that Smith was denied effective assistance of counsel at trial, that Mississippi's use of the "especially heinous" aggravating circumstance was unconstitutional, that the state's use of peremptory challenges to exclude blacks from the jury was unconstitutional, and that the district court erred in applying Mississippi's rules of procedural default and in denying Smith an evidentiary hearing. Each is considered in turn.

## II.

### A. *Perjury*

Smith argues primarily that Thomas and Wells lied at trial when they made an in-court identification of Smith as the perpetrator: subsequent, secretly taped conversations and formal interviews with the two witnesses, as well as their affidavits, substantially contradict their trial testimony. Smith has steadfastly objected in post-trial proceedings to the in-court identification by Thomas and Wells. After the Mississippi Supreme Court rejected similar contentions in Smith's original appeal and first petition for writ of error coram nobis, Smith filed a second petition with affidavits from Thomas and Wells explaining that they had lied in their pre-trial and in-court identifications of Smith. The Mississippi Supreme Court granted Smith's petition, affording him a hearing in state trial court on the allegation of perjury; in so doing, the court observed that "[t]hese witnesses' identification of Smith at trial formed an integral part of our opinion affirming his conviction." *See In re Smith*, 457 So.2d at 911. The lower court denied a new trial, and the Mississippi Supreme Court affirmed, concluding that although Thomas and Wells had perjured themselves, and the prosecution may have negligently used perjured testimony, the other evidence of guilt allowed no reasonable probability that the outcome was affected by the testimony. *Smith v. State*, 492 So.2d at 264. On habeas review, the federal district court below disagreed both with the Mississippi Supreme Court's determination that perjury had occurred and with the intimation that anything less than knowing use by the

prosecution might afford relief. As to the former, the court agreed with the state trial court that the recanting statements of Thomas and Wells were more suspect than their trial testimony, and that the contrary conclusion by the Mississippi Supreme Court was not fairly supported by the record. *Smith v. Thigpen,* 689 F.Supp. 644, 656–57 (S.D.Miss.1988) (citing 28 U.S.C. § 2254(d)(8)). From that conclusion, the district court reasoned that the prosecution could not be held to have known that the identifications were perjured. *Id.* at 657.

■■■ As a result, this case presents the rather unusual circumstance of the petitioner arguing for federal deference to state court fact-finding, *cf. Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); *Buxton v. Lynaugh,* 879 F.2d 140, 142–47 (5th Cir.1989), while the state would support the district court's re-reading of the record. As the district court recognized, there are situations when it is appropriate for a federal court to substitute its judgment on factual issues for that of the state court, even on habeas corpus review. However, that is unnecessary here: because we conclude that Smith needs to demonstrate knowing use of perjured testimony to secure relief, and does not do so, we need not reach the issue of whether the Mississippi Supreme Court was incorrect in concluding that Wells and Thomas had committed perjury.[1]

■■■ Smith does not appear to suggest that the perjury itself creates grounds for a new trial, but rather argues that the prosecution's behavior with regard to the perjury amounted to a constitutional viola-

tion. In this context, as the district court noted, resolving the allegations of perjury is unnecessary if the prosecution did not know of the perjury. The Fifth Circuit has long abided by the standard requiring that for use of perjured testimony to constitute constitutional error, the prosecution must have knowingly used the testimony to obtain a conviction. *See Mooney v. Holohan,* 294 U.S. 103, 110, 112, 55 S.Ct. 340, 341–42, 79 L.Ed. 791 (1935) (per curiam); *Hawkins v. Lynaugh,* 844 F.2d 1132, 1141 (5th Cir.), *cert. denied,* 488 U.S. 900, 109 S.Ct. 247, 102 L.Ed.2d 236 (1988); *Braxton v. Estelle,* 641 F.2d 392, 395 (5th Cir. Unit A 1981); *Skipper v. Wainwright,* 598 F.2d 425, 427 (5th Cir.) (per curiam), *cert. denied,* 444 U.S. 974, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979).

Smith's argument for an extension of the negligence standard of *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), is not sufficiently convincing to override this practice. As the district court explained, Smith's use of *Giglio v. United States,* 405 U.S. 150, 152–54, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104 (1972), to support the negligence standard is inapposite; *Giglio* concerned the particular circumstances of the nondisclosure of a promise of nonprosecution made in exchange for witness testimony. *Agurs* afterward reported that the rule of *Brady* may "arguably" apply in the situation in which "undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury," but was clear in reporting the subsequently settled rule that *knowing* use of perjured testimony was fundamentally unfair. 427

---

1. The district court did not specifically discuss two other allegations of perjury. The second, which the Mississippi Supreme Court observed, was that Thomas lied at trial when he said that he had identified Smith at the lineup conducted the day after the murder. 492 So.2d at 267. As explained below, Thomas clarified at trial that he had identified Smith, but not disclosed that identification to the prosecution; this explanation made sufficient sense that it would be difficult to conclude that Thomas had so perjured himself. The third, not discussed by the Mississippi Supreme Court, but mentioned at oral argument before this court, contends either that

Wells lied at trial when he said that he had been alone when he identified Smith's picture as that of the assailant, or that Bartlett lied in the coram nobis hearing when stating that he did not leave Wells alone with pictures. Bartlett's presence is relevant to assessing Wells' post-trial suggestion that he was able to identify Smith's picture by the name on the back. This perjury allegation is not apparent in Smith's state or federal pleadings, and we will not resolve it on appeal; we note, however, that Smith does not definitively frame an issue of trial perjury, but rather presents two inconsistent accounts, one of which was provided in post-trial proceedings.

U.S. at 103–04, 96 S.Ct. at 2397–98. The discussion in *Agurs* relied on by Smith more precisely refers to the materiality of nondisclosed evidence, a subject considered below in connection with his *Brady* claim.

■ Reviewed under the *Mooney* standard, and assuming without deciding that the in-court identification constituted perjury, Smith does not establish that the prosecution knew. *Cf. Braxton*, 641 F.2d at 395. For the very reasons detailed by the district court toward the contention that the testimony was *not* perjury, 689 F.Supp. at 652–57, the prosecutors could reasonably have concluded that the inconsistency of Wells and Thomas related to a reluctance to testify. Both evidenced a detailed observation of the abduction in their initial contact with the police, although they indicated on that occasion and others preceding trial that they could not identify the culprit. Thomas, however, contended at trial that he had in fact recognized Smith at the police lineup, and had so informed the prosecution on the first day of trial. Thomas coherently explained his vacillations: he had refrained from identifying Smith to the prosecution because of pressure he felt from relatives, and likewise had told Smith's sisters and defense counsel's son that he could not identify the perpetrator, but had to tell the truth when he was forced to testify under subpoena. Wells, the eyewitness whose testimony proved less damaging to Smith, simply testified that he had identified Smith at his first opportunity to do so, in the photographic lineup. The credibility of these explanations is cast into severest doubt by their after-trial recantations, but the prosecution cannot be charged with knowledge of their latent positions. We cannot conclude that what appears to have been the Mississippi Supreme Court's conclusion that the prosecution did not knowingly use perjured testimony, *Smith v. State*, 492 So.2d at 267, was not fairly supported by the record. *Sumner v. Mata*, 449 U.S. at 551–52, 101 S.Ct. at 771.

### B. *Continued Use of Perjured Testimony*

■ Smith also argues that given present knowledge of perjury, his convic-

tion cannot be left undisturbed. Smith relies on *Sanders v. Sullivan*, 863 F.2d 218 (2d Cir.1988), which found that a state violates due process if it allows a conviction to stand after an eyewitness credibly recants material testimony. To be material, according to *Sanders*, perjured testimony "must be of an extraordinary nature[,] ... leav[ing] the court with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Id.* at 226. At its core, *Sanders* disputes the necessity of demonstrating prosecutorial involvement in or knowledge of the perjured testimony. *Id.* at 224–25.

As *Sanders* itself notes, its pronouncement differs from the rule adhered to in the Fifth Circuit. *See id.* at 222 n. 2 (citing *United States v. Jones*, 614 F.2d 80, 82 (5th Cir.), *cert. denied*, 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 801 (1980)). Given the understanding of *United States v. Agurs* expressed above, this court's rule appears more consistent with the view taken by the Supreme Court, and Smith does not present an argument for its change.

### C. *Failure to Disclose Exculpatory Material*

Smith makes the related claim that the State withheld police investigative files critical to assessing the credibility of Thomas and Wells, in particular to assessing the credibility of the identification by Thomas and Wells. According to Smith's amended habeas petition, the withheld files contained:

(1) written statements by Thomas and Wells stating that they could not identify Roberts' assailant; (2) a lineup report showing that Thomas was unable to pick Smith out of a lineup shortly after the incident; (3) the reports of the investigating officers demonstrating that Thomas and Wells were not able to describe either the Roberts' assailant [sic] or his car with any detail when they first spoke to the police and the District Attorney's officer; and (4) the notes of the police radio communication calls, indicating the very

limited informations given by Thomas and Wells to the investigation police officer, Sgt. Oatis, in the Tote–Sum store parking lot just twenty minutes after the incident that occurred there. Such information was obviously critical to Petitioner's case: not only for purposes of impeaching the testimony of Thomas, Wells and the State's other witnesses at trial, but also for purposes of impeaching Sgt. Oatis' testimony at the suppression hearing. [Record citations omitted].

Most striking are the sworn statements from Thomas and Wells and their summary by a police detective: taken the day after and three days after the crime, respectively, they fail to provide any more information about the perpetrator than that he was a black male. In Wells' sworn statement, he summarized his identification in response to questioning:

Q: Would you know this man if you saw him again.

A: I don't think I would I did not get a good look at him.

Q: Do you think that you would recognize the car if you saw it again.

A: I don't think I could I did not get a good look at it either.

The Mississippi Supreme Court appears to have assumed that the information was not in fact provided to Smith or his trial counsel by the prosecution, but instead first surfaced at the second coram nobis hearing. 500 So.2d at 979; *see also* 492 So.2d at 264. Focusing particularly on the witness statements from Thomas and Wells, however, the court concluded that the information they contained was not favorable to Smith and in any event was not such as to undermine confidence in the outcome of the trial. 500 So.2d at 979. On habeas review the district court below substantially agreed, rejecting Smith's claim for three reasons: first, the state substantially complied with Smith's request; second, Smith substantially knew the testimony of Thomas and Wells, effectively answering his own request; and third, the police record contained no evidence "favorable" to Smith, and thus under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), need not have been disclosed, at least not before the witnesses testified. 689 F.Supp. at 658.

Successful establishment of a *Brady* claim requires three findings: (1) that evidence was suppressed; (2) that this evidence was favorable to the accused; and (3) that the evidence was material either to guilt or punishment. *Brogdon v. Blackburn*, 790 F.2d 1164, 1167 (5th Cir.1986) (per curiam), *cert. denied*, 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987).

1. Suppression or Nondisclosure of the Evidence

Smith moved for discovery of any *Brady* material in a discovery request filed May 28, 1981, and the district court ordered compliance through in camera inspection in an order dated June 19, 1981. Under *United States v. Agurs*, 427 U.S. at 106–07, 96 S.Ct. at 2399, Smith's claim is not mooted by a failure to request information with greater specificity; *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985), in collapsing *Brady*'s distinction between the categories of requests, presumably reinforces this notion.[2]

The state conceded at the coram nobis hearing that it would have possessed and inspected the police files, and has not contended at any point in this extended litigation that the reports were received by Smith or his counsel, instead focusing on whether the information was otherwise made known to them. The district court essentially agreed, suggesting the defense *functionally* received the evidence, since

---

**2.** However, *Bagley* did regard the request's specificity as pertinent to the assessment of *materiality*, in that "an incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist." The Court noted that specificity did not affect the different standard of review, but figured only as one aspect of the "totality of circumstances," and that the necessary "but for" inquiry might prove difficult to conduct on appeal. 473 U.S. at 682–83, 105 S.Ct. at 3383–84. *Cf. Lindsey v. King*, 769 F.2d 1034, 1041 (5th Cir.1985).

"Smith knew that Thomas and Wells had not identified him to the police, and Smith obtained statements from Thomas and Wells stating they could not identify him." 689 F.Supp. at 658. This analysis goes at most to the issue of materiality. Smith at no point in the trial evidenced knowledge that neither Thomas nor Wells had been able to describe the assailant in statements to the police made shortly after the victim's death, and knowledge of other sources of impeachment does not deprive him as a threshold matter of the right to additional, discrete bases for impeachment residing in material possessed by the prosecution. Moreover, Smith argues that the nondisclosure impaired his ability to impeach Oatis' testimony at the suppression hearing, an application for which the timing of the disclosure was critical.

### 2. Exculpatory Nature of Evidence

■ The district court also concluded that the information in the police record was not sufficiently "favorable" to Smith to qualify under *Brady*, as "Smith could have used the record only as a source of additional prior inconsistent statements to impeach the state's witnesses." *Id.* at 658. Again, this is only an assertion that the material's revelation would have been immaterial to the outcome, as impeachment material is clearly exculpatory and qualifies as *Brady* material. *United States v. Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380; *United States v. Irwin*, 661 F.2d 1063, 1068 (5th Cir.1981), *cert. denied*, 456 U.S. 907, 102 S.Ct. 1754, 72 L.Ed.2d 164 (1982); *United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir.1978). This is true as well of material that provides an additional, but not exclusive, basis for impeachment. *See Monroe v. Blackburn*, 607 F.2d 148, 152 (5th Cir.1979), *cert. denied*, 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 816 (1980).

■ The nondisclosed statements of Thomas and Wells were not sheerly redundant, but rather constituted the most contemporary appraisals of their alleged observation of Smith, and combined with their failure to previously identify Smith as the person they observed cast doubt on the credibility of their latent identifications and on the testimony of Oatis. The statements are more than merely cumulative; Thomas and Wells both evidence an inability to *describe* the assailant, a distinct cognitive exercise from the identification of a suspect as the assailant. Equally important, the statements are less easily explicable than the inconsistencies stressed by Smith's counsel in his cross-examination of Thomas and Wells, which were excused at trial as the product of various pressures brought to bear on the eyewitnesses. A jury might reasonably doubt the credibility of witnesses who had earlier sworn ignorance before the police as well.

### 3. Materiality

■ In *United States v. Bagley*, a majority of the Supreme Court imported the materiality test of *Strickland v. Washington* for use in all cases involving

> [P]rosecutorial failure to disclose evidence favorable to the accused: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

473 U.S. at 682, 105 S.Ct. at 3383 (opinion of Blackmun, J.); *id.* at 685, 105 S.Ct. at 3385 (opinion of White, J.); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 55–59, 107 S.Ct. 989, 1001–02, 94 L.Ed.2d 40 (1987).

■ Smith's discussion of his *Brady* claim is unfortunately synchronized with his perjury claim, leading him to identify all aspects of the police record that would cast doubt on the trial testimony of Thomas and Wells. *Brady* does not extend so far: the doctrine exempts information that the defense could have obtained from other sources by exercising reasonable diligence, *see, e.g., United States v. Bi–Co Pavers, Inc.*, 741 F.2d 730, 736 (5th Cir.1984), and to the extent that Smith's argument rests on supposed revelations like the difficulties of precise identification in the pre-dawn hours, across a parking lot, and from a moving vehicle, it must fail.

The nondisclosed statements made by Thomas and Wells to the police, however, present a much closer issue. As suggested above, the statements and their verification by other elements of the police record are relevant to several stages of trial.

#### (a) *Suppression Hearing*

 First, Smith has consistently suggested since their disclosure that he was materially impaired in his ability to impeach Oatis' testimony at the suppression hearing, which related to the seizure without warrant of items from the defendant's home and from the car he had borrowed. At that hearing, Oatis described Thomas and Wells' description of the suspect and his vehicle as follows:

> Black male subject, medium Afro, medium dark complexion, rather short stature. They went on to describe mostly his vehicle.
>
> Q: What description did they give you of the vehicle?
>
> A: They stated that it was a red Pinto, approximately a '70 model. That the vehicle possibly had a decal of some type in the back of the vehicle.
>
> \* \* \* \* \* \*
>
> A: Vehicle appeared to have—excuse me—appeared to have a—a part of the grill cracked or broken in the front of the vehicle. Also some light color material appeared to on the dashboard of the car. After I asked for a special identification on the vehicle, that's what they told me.
>
> Q: What kind of material would you say it was on the dash of the vehicle?
>
> A: I believe they stated it was some type of material resembling carpeting.
>
> Q: At the time they told you about the car and the black male, what exactly was the next thing that you did?
>
> A: At that time, I immediately radioed for all the units to be on the lookout for such a vehicle.

The police records indicate a significantly less detailed description of the suspect and his car, and Thomas and Wells later renounced the additional details as manufactured under pressure from the police. Not having the information garnered from the personal interviews of the putative eye-witnesses, who were under no obligation to cooperate with the defense, and not having benefit of cross-examination and disclosures such as would later occur at trial, Smith was severely handicapped in his ability to impeach Oatis by the nondisclosure of the witness statements, police reports, and notes from the radio call.

 Timing is critical to proper *Brady* disclosure, *see United States v. Peters*, 732 F.2d 1004, 1008–09 (1st Cir.1984), and objections may be made under *Brady* to the state's failure to disclose material evidence prior to a suppression hearing. *See, e.g., United States v. Lanford*, 838 F.2d 1351, 1355 (5th Cir.1988); *United States v. Xheka*, 704 F.2d 974, 982 (7th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983).[3] Such claims are not proscribed by *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Although we have previously held *Brady* claims to be foreclosed on habeas review because of *Stone*, *see O'Quinn v. Estelle*, 574 F.2d 1208, 1209–10 (5th Cir.1978), *cert. denied*, 440 U.S. 919, 99 S.Ct. 1239, 59 L.Ed.2d 469 (1979), and the district court here required Smith to establish that the suppression hearing was not "full and fair" within the meaning of *Stone*, 689 F.Supp. at 659, Smith's claim is transparently of the variety falling without *Stone*, since it attempts to measure the breach of a right arising under the Constitution rather than presenting a claim primarily relying on the exclusionary or another judge-made rule. *See Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97; *cf. Stone*, 428 U.S. at 495 n. 37, 96 S.Ct. at 3052–53 n. 37; *Kimmelman v. Morrison*, 477 U.S. 365, 375–83, 106 S.Ct. 2574, 2583–87, 91 L.Ed.2d 305 (1986).

The appropriate assessment for *Brady* purposes, of course, is whether nondisclosure affected the outcome of the suppres-

---

**3.** Because this case entails review of a state criminal conviction, we need not confront any tension between this requirement and the Jencks Act. *Cf. United States v. Campagnuolo*, 592 F.2d 852, 859–60 (5th Cir.1979).

sion hearing. Notwithstanding the statements provided by Thomas and Wells, and the terse notes made from the police radio communication, the factfinder might have believed Oatis' contention that the eyewitnesses were initially more forthcoming regarding the description of the suspect and his vehicle. Even if he were disbelieved, the uncontradicted account in the log of police radio communication would have the police alerted at 5:37 a.m. to watch for a "B/M in RED FORD PINTO." Another police officer, Grice, testified at the suppression hearing that he was told by Oatis upon arriving at the crime scene at approximately 5:40–5:45 a.m. that they were looking for a red Pinto. According to his testimony at the suppression hearing, at around 6:15 or 6:20 a.m., Oatis, still at the Tote–Sum store, observed a black man in a red Pinto approach. The car, the only one on the street at that time, then "sudden[ly]" and "hastily" executed a U-turn and drove away. Oatis testified without contradiction at the suppression hearing that Smith had executed this turn in a car wash located "a few yards away" from his location, and Smith testified at the same hearing that he had reversed direction upon seeing a number of lights and suspecting that the police cars were assembled to check licenses. While pursuing Smith, Oatis testified, he observed Smith place something below him and to the right side of the car, and testified that when stopped Smith could not produce a driver's license and became belligerent. Oatis then testified that he saw through the window of the Pinto the mate to the shoe he had found in the parking lot, whereupon he arrested and handcuffed Smith. Oatis explained that he did not notice the blood and mud on Smith's hands until after the arrest. Smith did not deny turning the vehicle around abruptly to avoid the police, but testified that Oatis had only observed him drop a cigarette and that the police must have planted the shoe in his car.

We cannot say that a factfinder presented with this account, and thus aided by the nondisclosed evidence and lacking the supposed embellishment by Oatis, would have decided to suppress the evidence and thus disturb also the accumulation of proof against Smith cultivated by the search of his apartment. An officer may conduct an investigative stop of a moving vehicle based upon a reasonable suspicion of criminal activity. *See, e.g., United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) (citing cases). The police possessed information that reasonably attracted their attention to Smith, quite apart from the fact that his was the only car on the neighboring streets at that hour of the morning, and his evasive maneuver confirmed their suspicion. *See, e.g., Scruggs v. State,* 412 So.2d 732, 734 (Miss. 1981); *cf. United States v. Hasette,* 898 F.2d 994, 995 n. 2 (5th Cir.1990) (per curiam) (citing cases regarding vehicular evasion of temporary checkpoints); *Boches v. State,* 506 So.2d 254, 264 (Miss.1987) (same). Smith does not suggest on appeal that evaluation of the conduct of the post-stop investigation—the sighting of the missing shoe, the arrest of Smith, the questioning of MacDonald, or the search of Smith's apartment—was otherwise adversely influenced by the nondisclosure.

### (b) *Guilt Phase*

 Smith does not suggest on appeal any complicated trial dynamic resulting from the nondisclosure, except to suggest in passing that his trial counsel's defense theory was upset by the testimony of Thomas and Wells;[4] rather, he argues simply that the eyewitness testimony was essential to the conviction and sentence of death, and that the absence of the police

---

**4.** *Bagley* evidences concern with "any adverse affect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case." 473 U.S. at 683, 105 S.Ct. at 3384. Smith's suggestion that the eyewitness testimony upset his trial counsel's strategy, however, is unconvincing. The defense knew the identity of the witnesses, alluded

to them in his opening statement, and did not object to their appearance at trial. Moreover, because his *Brady* request was general in nature, he cannot claim that the nondisclosure convinced him that the state had no recorded contact with Thomas and Wells. *See id.* at 682–83, 105 S.Ct. at 3383–84.

records made Thomas and Wells seem more credible in their trial testimony. The importance of impeaching witnesses is implicit in the *Brady* cases regarding impeaching evidence as material. *See, e.g., United States v. Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380; *Agurs,* 427 U.S. at 113 n. 21, 96 S.Ct. at 2402 n. 21; *Giglio v. United States,* 405 U.S. at 153–55, 92 S.Ct. at 765–66; *United States v. Irwin,* 661 F.2d at 1068 (5th Cir.1981); *Hudson v. Blackburn,* 601 F.2d 785, 789 n. 6 (5th Cir.1979), *cert. denied,* 444 U.S. 1086, 100 S.Ct. 1046, 62 L.Ed.2d 772 (1980); *United States v. Anderson,* 574 F.2d at 1355. It is a commonplace that eyewitness testimony is highly regarded by juries, rather more than its objective appraisal might warrant. *See, e.g., Kampshoff v. Smith,* 698 F.2d 581, 585–87 (2d Cir.1983); *United States v. Beasley,* 576 F.2d 626, 633 (5th Cir.1978), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979). Accordingly, this court has on a number of occasions observed that the nondisclosure of evidence that could be used to impeach a key witness constitutes a *Brady* violation warranting a new trial. *See, e.g., Lindsey v. King,* 769 F.2d at 1042–43; *Monroe v. Blackburn,* 607 F.2d at 152; *Martinez v. Wainwright,* 621 F.2d 184, 188 (5th Cir.1980); *Jackson v. Wainwright,* 390 F.2d 288, 298–99 (5th Cir.1968); *Guerrero v. Beto,* 384 F.2d 886 (5th Cir. 1967) (per curiam).

■ The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state. In *Lindsey v. King,* for example, this court found that the state's case rested on two eyewitnesses who identified the defendant and one nonidentifying eyewitness. The state did not disclose an earlier statement by one of the identifying eyewitnesses that he did not see the perpetrator's face. Although the other eyewitness' testimony was unshaken, the court concluded that the identification by two unshaken witnesses was critical to the trial, particularly in light of the poor circumstances for identification and the defendant's contention that his companion, who "bore a striking resemblance" to the defendant, had in fact committed the crime. 769

F.2d at 1042–43. In *Monroe,* this court held that notwithstanding strongly corroborating physical evidence, the prosecutor's failure to turn over statements made by an eyewitness to the police constituted a *Brady* violation. Even though the witness admitted on cross-examination that "he did not get a good look at the robber and was not able positively to identify [the defendant] as the robber when he was brought back to the scene," the court held that the absence of any reference in the police statement to a noise that the witness stated at trial he had heard went "directly to a substantive issue and could be used in urging that the in-court testimony has been 'improved' by the erroneous addition of what the prosecution needed to support its theory." 607 F.2d at 152.

■ In evaluating the case against Smith, we must avoid, as *Lindsey* cautioned, an "arithmetical approach" to redacting the nondisclosed evidence, 769 F.2d at 1042, and instead attend to "what the convicting jury had before it as opposed to what the new jury will not." *Smith v. State,* 492 So.2d at 266. In ordering a coram nobis hearing on the issue of perjury, the Mississippi Supreme Court noted that the "witnesses' identification of Smith at trial formed an integral part of our opinion affirming his conviction," *In re Smith,* 457 So.2d at 911 (Miss.1984), and the district court acknowledged that Thomas and Wells were "valuable witnesses." 689 F.Supp. at 649.

This understood, we cannot conclude that our confidence in the outcome is undermined by the *Brady* violation. First, the persuasive value of the police records as impeachment material for Thomas and Wells is less than crystalline. Wells, for example, admitted at trial that he had never before the photographic lineup been able to identify Smith as the perpetrator, that he was able to indicate Smith in the courtroom because he was distinctively positioned and clad, and, ultimately, that he could not identify Smith as the perpetrator. Thomas, a convicted armed robber, admitted that he had not identified Smith at the lineup, that he had previously stated that

he could not identify the perpetrator, and that he had seen Smith at the suppression hearing. Both men admitted that they had previously lied to avoid identifying Smith, that they had just identified him before trial, and that one way they could identify Smith was simply because of his involvement with the proceedings. Although their impeachment was not as complete as it would be had they possessed the nondisclosed records, *see Hudson v. Blackburn*, 601 F.2d at 789, it was sufficiently complete to diminish the materiality of the *Brady* materials. *See, e.g., United States v. Xheka*, 704 F.2d at 983. The remaining credibility of the eyewitnesses, precariously balanced on their latent realizations and fears of subpoenas, could not be impeached by the materials.

Second, and equally important, the circumstantial evidence presented by the state was objectively overwhelming. Smith drove by the scene of the crime in a vehicle like that unequivocally described by at least one eyewitness and attempted to evade the police just forty-five minutes or so after the abduction of the victim. In his car was the matching shoe to one found in the Tote–Sum parking lot. Also in the parking lot was a pair of brass knuckles arguably identical to a pair he admittedly possessed. His hand was stained with human blood. In his apartment, on his bed, was the victim's sweater and purse, and on the floor were items of his clothing covered with mud and blood. The blood on his pair of khaki pants was almost certainly that of the victim. Hair likely to have been the victim's was found on the bed. Two one hundred dollar bills arguably belonging to the victim were distributed between his discarded pants and the pair he was wearing when arrested. The victim's body was partially buried fifty yards behind his apartment building. Her head bore wounds made by a blunt instrument, and her pubic hair contained a pubic hair similar to Smith's.

In response to this case, and the eyewitness testimony, Smith offered an alibi that was simply implausible. Without producing any corroborating physical proof or witnesses, Smith suggested in essence that another had taken uncontested control of his apartment, taken advantage of Smith's mysterious collapse to don clothing that Smith had chosen to doff, borrowed the car Smith had previously borrowed, abducted the victim, returned to Smith's apartment, killed and hidden the victim, removed Smith's clothing, and departed just as Smith awoke and saw the perpetrator's shadow. One witness for the state said that Smith had been inside the Tote–Sum store shortly before the crime, contradicting Smith's claim to have never been there. The jury was entitled to disbelieve the rest of his account. Unlike *Lindsey*, which produced a tangible person of very similar appearance at the scene of the crime, 769 F.2d at 1042–43, Smith did not make an effective case for mistaken identity; unlike *Monroe*, circumstantial evidence connected Smith with the crime, the victim's possessions, and the victim's body. 607 F.2d at 149, 152. Although the state ought to have disclosed the police records, and although the conduct of the trial may have been affected by their failure to do so, we cannot conclude that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See, e.g., United States v. Weintraub*, 871 F.2d 1257, 1262–64 (5th Cir.1989); *Chaney v. Brown*, 730 F.2d 1334, 1350 & n. 21 (10th Cir.1984).

### (c) *Punishment Phase*

Smith also argues that the nondisclosure of evidence affected the sentencing phase by contributing to the removal of residual doubt. The trial court rejected Smith's proffer of an instruction detailing residual doubt as a mitigating circumstance, but its instructions did permit the jury to entertain doubt in that fashion, and Smith's trial counsel repeatedly stressed the possible innocence of his client in his closing at the sentencing phase. We have previously recognized such reargument of guilt as a sound strategy. *Stringer v. Jackson*, 862 F.2d 1108, 1116 (5th Cir.1988). Although Smith was not constitutionally entitled to instruct the jury to consider

such residual doubt, *Franklin v. Lynaugh,* 487 U.S. 164, 174–77, 108 S.Ct. 2320, 2327–28, 101 L.Ed.2d 155 (1988), the Supreme Court has subsequently recognized a difference between rules relating to *what* mitigating evidence the jury may consider and rules relating to instructing the jury *how* to consider such evidence. *Saffle v. Parks,* — U.S. ——, ——, 110 S.Ct. 1257, 1261, 108 L.Ed.2d 415 (1990). Here the claim is still simpler: Smith asks not for a revision of the court's determination of what evidence he may present to the jury, but only that we assess the materiality of the *Brady* violation in light of the mitigating case actually presented for him. We agree that nondisclosure of impeachment evidence may be relevant to the punishment phase, *see Lindsey v. King,* 769 F.2d at 1042, and reject the intimation that this aspect of Smith's claim may have no constitutional footing. *Cf. Jones v. Butler,* 864 F.2d 348, 357 (5th Cir.1988) (alternative holding), *cert. denied,* — U.S. ——, 109 S.Ct. 2090, 104 L.Ed.2d 653 (1989).

For the reasons expressed above, however, we seriously doubt that disclosure of the *Brady* materials would have affected the jury's view of Smith's innocence. Smith presented no more evidence suggesting his innocence, and his witnesses in mitigation were of little assistance; his mother testified that he had been previously involved in two shootings, allegedly in self-defense, and his aunt confirmed that in one of the incidents a child had been shot. The state also presented evidence that the victim had been sexually assaulted, and argued without material contradiction—but for the suggestion that Smith was innocent of wrongdoing—that Smith's crime had involved robbery, kidnapping, and a brutal slaying. We conclude that the jury's residual doubt would not have been materially affected by compliance with *Brady.*

D. *Accusations of Rape at Sentencing Proceeding*

Smith objects to the prosecution's presentation of evidence during the sentencing phase that suggested Smith had raped the victim before her death, and to the prosecution's emphasis on that allegation during argument to the jury regarding the aggravating circumstances surrounding the crime. First, he argues that the use of the rape allegation in support of an aggravating circumstance amounted to (or perhaps was analogous to) being convicted of a crime without being so charged or being sentenced for a crime without being so convicted. Second, Smith argues that alleging commission of a rape while knowingly being unable to offer competent evidence violated "fundamental fairness." Third, Smith argues that "death sentences must 'be, and appear to be, based on reason rather than caprice or emotion.' *Gardner v. Florida,* 430 U.S. 349, 358 [97 S.Ct. 1197, 1204, 51 L.Ed.2d 393] (1977)." In support of this argument, he contends that the State unfairly surprised defense counsel with the rape testimony and argument at the sentencing phase, as well as unduly interjecting an emotional and volatile allegation into the proceedings without basis in fact.

The conduct cited to support Smith's allegations was not discussed by either the Mississippi Supreme Court or the district court below, warranting brief review here. Although the prosecution initially sought indictment for capital murder during the course of rape, the grand jury returned an indictment for murder during the course of robbery. Nevertheless, during his voir dire of the first panel of potential jurors, the prosecutor began by reporting that "[a]s the Judge has told you briefly, this defendant is charged with having seized a person, taken them against their will, robbed them, raped them and murdered them." An objection to the rape reference on the grounds that it was not contained in the indictment was sustained, but no cautioning instruction was given. During questioning of a second panel, the prosecutor asked whether any of the potential jurors "ever had a sister or a mother or a brother that's been raped, abducted, murdered or robbed?" Defense counsel objected on the same grounds as before but was overruled.

During questioning of the examining pathologist at trial, the prosecutor was cautioned by the judge not to discuss vaginal

swabs taken from the victim that afforded an inconclusive comparison to a semen sample taken from Smith. The prosecutor later introduced evidence that found similarity between pubic hair recovered from the pubic hair of the victim and a sample submitted from Smith, and also found similarity between head and pubic hair sample taken from the victim and pubic hair recovered from bed clothing and a sweater found in Smith's bedroom and head hair recovered from the bed clothing. The testimony regarding the comparison focused chiefly on the racial characteristics of the samples. The evidence was admitted over defense counsel's objections and motion for mistrial on the grounds that "[t]he prosecution obviously is attempting to inflame this jury by offering proof before this jury of another crime, namely rape, which is not charged in the indictment." The prosecutor also introduced evidence that the victim's shirt was on inside out and that her bra was pulled up when her body was recovered from behind Smith's apartment. Speaking generally to Smith's allegations, the district court concluded that "the prosecution carefully guarded against any reference to rape at the guilt phase of the trial, repeatedly cautioning its witnesses to avoid any reference to those allegations. The prosecution had to caution them because the evidence of sexual abuse was substantial and apparent to everyone. It is obvious that the motive of this crime was not simply robbery." 689 F.Supp. at 660.

This evidence was later resubmitted to the jury during the sentencing phase. In addition, the prosecution recalled the forensic pathologist who had performed the autopsy, this time to testify that he had found evidence of recent sexual intercourse. The prosecution also recalled the serologist who had testified at the guilt phase regarding the comparison of blood samples, who testified in her second appearance that vaginal swabs taken from the victim revealed numerous sperm. Defense counsel unsuccessfully objected on the grounds that the testimony did not correspond to the indictment and was inflammatory. On cross-examination, the serologist admitted that she was unable to identify the sperm and se-

men taken from the victim as that of Smith, which the prosecution had previously admitted during a conference out of the presence of the jury during the guilt phase.

During their summations to the jury during the sentencing phase, the prosecutors referred twelve times to the allegation that Smith had raped the victim, and the judge overruled defense counsel's objection following a reference to the serologist's discussion of the sperm sample taken from the victim. During both closing arguments the prosecution displayed a slide of the victim's body. Following defense counsel's unsuccessful objection to the continued display of the slide, the lead prosecutor suggested to the jury the following:

> Do you know why they didn't want that on? Do you know why they didn't want that on? Because they didn't want you to see her shirt on inside out. They didn't want you to see that brassiere pulled up around her neck. They didn't want you to remember that, in addition to killing her, robbing her, kidnapping her, that he raped her. And we don't know how many times. All we know is that Mrs. Ard [the serologist] said numerous—and she stressed numerous— sperm cells.

Although the jury was not charged with the option, available under the Mississippi sentencing statute, of deciding on rape or sexual battery as an aggravating factor, it was charged with determining whether the crime was heinous, and found heinousness as one of three aggravating factors necessitating the death penalty.

### 1. Procedural Bar

■ On collateral review of this claim, the Mississippi Supreme Court held that it was barred because it was not raised on direct review. *Smith v. Mississippi*, 434 So.2d 212, 216 (Miss.1983). The district court, although receptive to procedural bars with regard to other claims, 689 F.Supp. at 661–63, did not discuss any procedural impediments to this claim. On appeal to this court, the state appears to infer that the district court's decision was based on the ruling of *Johnson v. Thigpen*, 623

F.Supp. 1121, 1127–28 (S.D.Miss.1985), *aff'd*, 806 F.2d 1243 (5th Cir.1986), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1618, 94 L.Ed.2d 802 (1987), and does not dispute the continued vitality of the claim. Br. at 19 n. 1. Smith, in turn, views the state to have conceded the incorrectness of the state court's decision. Reply Br. at 10. Since counsel objected at trial, since direct appeal was taken prior to the Mississippi Supreme Court's decision in *Wheat v. Thigpen*, 431 So.2d 486 (Miss.1983), and since that court plainly relied on the newly restrictive rule it had announced in *Edwards v. Thigpen, see Smith*, 434 So.2d at 216, Smith has not procedurally defaulted on his claim by failing to appeal the error on direct review in state court. *Edwards v. Scroggy*, 849 F.2d 204, 209 n. 4 (5th Cir. 1988), *cert. denied*, — U.S. —, 109 S.Ct. 1328, 103 L.Ed.2d 597 (1989); *Wheat v. Thigpen*, 793 F.2d 621, 625–26 (5th Cir. 1986); *Johnson v. Thigpen*, 623 F.Supp. at 1127–28; *Edwards v. Thigpen*, 595 F.Supp. 1271, 1278–79 (S.D. Miss.1984).

### 2. Merits

#### (a) *Conviction For An Unindicted Crime*

As the district court observed, Smith's allegation that he was convicted for a crime for which he had not been charged and which had not been proven, in violation of the rule of *Presnell v. Georgia*, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978), is without merit, as it implies the presence of a discrepancy between the guilt and punishment determinations which is not present in this case. *Presnell* reversed a decision by the Georgia Supreme Court which found that the jury had not properly convicted the defendant of any capital offense, but had then upheld a death sentence upon concluding that the evidence supported the defendant's guilt of a capital crime despite the lack of a jury finding. *Id.* at 16, 99 S.Ct. at 236. Smith was duly convicted of a capital crime and sentenced to death after the jury found the aggravating factors of robbery, pecuniary gain, and heinousness. The district court observed that rape allegations were probably argued in support of the factor that the murder was especially heinous, atrocious or cruel. 689 F.Supp. at 660. It cannot be concluded that Smith was convicted of a charge that was never made or tried by jury, *see Cole v. Arkansas*, 333 U.S. 196, 201–02, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948), or that he is being punished on the assumption of same.

#### (b) *Surprise*

Smith's account of the focus on rape at sentencing also makes out the allegation that his defense was "ambushed" without notice by the sudden emphasis at sentencing on the rape allegation. Understood narrowly as an evidentiary objection, it is doubtful that Smith has preserved the claim for federal review. Specific objections to surprise caused by untimely revelations that the pathologist and serologist would testify were last raised in Smith's first petition for collateral review before the Mississippi Supreme Court, where they were deemed procedurally barred. 434 So.2d at 218. Federal habeas corpus review of such unfair surprise claims looks to state procedure for objection and continuance. *Davis v. Maggio*, 706 F.2d 568, 570–71 (5th Cir.1983); *Smith v. Estelle*, 602 F.2d 694, 701 n. 8 (5th Cir.1979), *aff'd*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In Mississippi, trial courts confronting discovery violations are to require defense objection, afford a reasonable opportunity to review the evidence, then require that the defense request a continuance. *See, e.g., Cole v. State*, 525 So.2d 365, 367–68 (Miss.1987), *cert. denied*, — U.S. —, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988). Smith's counsel neither objected on the grounds of surprise nor requested a continuance, although he later objected to the prosecution's use of the evidence during its closings. *Cf. In re Hill*, 460 So.2d 792, 800 (Miss.1984).

Assuming without deciding that this particular aspect of Smith's claim is properly before this court, it is not persuasive. It is revealing that Smith initially sought habeas relief on the basis that the state unfairly injected allegations of rape into the guilt phase as well: even if the

prosecution emphasized the rape allegation less at the guilt phase than it did during sentencing, it cannot be said that the subject came as a surprise at the punishment phase. With regard to the serologist's testimony regarding the semen samples, Smith may have been justified in depending on the judge's determination at the guilt phase that the evidence could not be offered to identify him, but his counsel successfully brought out on cross-examination at the punishment phase the very lack of conclusiveness that weighed against the evidence at its initial proffer.

### (c) *Fundamental Unfairness*

■ Read more broadly, Smith's claim alleges that the sudden shift in emphasis at sentencing, the references to evidence known to be inconclusive, and the inflammatory argument of the prosecution combined to violate his due process rights. Smith's surprise argument could also be understood more broadly as evoking the caution of *Gholson v. Estelle* that "[i]f a person is to be executed, it should be as a result of a decision based on reason and reliable evidence—not as a result of ambush." 675 F.2d 734, 738 (5th Cir.1982)

Smith does not suggest that the prosecution thereby violated any specific guarantee of the Bill of Rights,[5] but rather that its conduct of the trial infected the trial with unfairness. The court below accurately summed up the accepted standard of review:

On a writ of habeas corpus, the appropriate standard for review of the claims of improper argument by the prosecution is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144, 157 (1986) (*citing Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431, 436 (1974)). The relevant question, therefore, is whether "the prosecutor's comments 'so infected the trial with unfairness as to

make the resulting conviction a denial of due process.'" *Id.* It is "not enough that the prosecutors' remarks were undesirable or even universally condemned." *Id.*

689 F.Supp. at 660. The test was put more concretely in *Felde v. Blackburn:*

To establish that a prosecutor's remarks are so inflammatory as to prejudice the substantial rights of a defendant, the petitioner must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.

795 F.2d 400, 403 (5th Cir.1986), *cert. denied*, 484 U.S. 873, 108 S.Ct. 210, 98 L.Ed.2d 161 (1987); *see also Jones v. Butler*, 864 F.2d 348, 356 (5th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 2090, 104 L.Ed.2d 653 (1989); *Byrne v. Butler*, 845 F.2d 501, 507 (5th Cir.1988), *cert. denied*, 487 U.S. 1242, 108 S.Ct. 2918, 101 L.Ed.2d 949 (1988).

The district court found Smith's arguments unconvincing on two grounds: first, "[o]nly one aggravating factor was necessary, and it cannot be doubted that the jury would have found the aggravating factor of robbery regardless of the injection of the rape argument by the prosecution"; second, the prosecution was simply "articulat[ing] the implications" apparent at the guilt phase. The state echoes these arguments on appeal. We affirm the district court on slightly different grounds.

■ The ambit of the punishment phase of a bifurcated capital proceeding is purposefully broader than that of the guilt phase. As the Supreme Court observed in *Eddings v. Oklahoma*, a just and constitutional capital sentencing requires that there be taken into account "the circumstances of the offense together with the character and propensities of the offender." 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982) (quoting *Pennsylvania v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 60, 82 L.Ed.

---

**5.** *Cf. Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir.

1988); *O'Bryan v. Estelle*, 714 F.2d 365, 387 (5th Cir.1983), *cert. denied*, 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984).

43 (1937)). Indeed, the need to account for the circumstances of the crime at sentencing may justify the introduction of otherwise constitutionally violative arguments or evidence. *See South Carolina v. Gathers,* ── U.S. ──, ──, 109 S.Ct. 2207, 2211, 104 L.Ed.2d 876 (1989); *Booth v. Maryland,* 482 U.S. 496, 507, 107 S.Ct. 2529, 2535, 96 L.Ed.2d 440 (1987).

▆ Correspondingly, the prosecution's argument to the jury, at any stage encompassing the right to comment on and draw reasonable conclusions from physical evidence which is before the jury, *Cannon v. State,* 190 So.2d 848, 851 (Miss.1966) (citing cases), and the right to draw inferences from the testimony of witnesses, *see Snowden v. State,* 356 So.2d 1143, 1144–45 (Miss.1978); *Ragan v. State,* 318 So.2d 879, 882–83 (Miss.1975) (citing cases), is given broad latitude at the punishment phase absent argument of some impermissible factor, such as comment on the defendant's failure to testify or the prospect of appellate review insuring the jury verdict. *See Cabello v. State,* 471 So.2d 332, 346 (Miss. 1985); *Neal v. State,* 451 So.2d 743, 762 & n. 12 (Miss.1984); *see also Minnick v. State,* 551 So.2d 77, 92–93 (Miss.1988); *Harris v. State,* 537 So.2d 1325, 1329–31 (Miss.1989); *Lanier v. State,* 533 So.2d 473, 483 (Miss.1988); *Woodward v. State,* 533 So.2d 418, 433–34 (Miss.1988), *cert. denied,* ── U.S. ──, 109 S.Ct. 1767, 104 L.Ed.2d 202 (1989). The Mississippi Supreme Court has cautioned that "[t]he trial judge should not interfere with argument unless counsel clearly and conclusively exceeds the legitimate field of the argument." *Gray v. State,* 351 So.2d 1342, 1346 (Miss.1977), *cert. denied,* 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 847 (1980). Our standard in reviewing for error of constitutional magnitude must be less exacting still.

Keeping these principles in mind, Smith's argument must be reviewed in the context of the trial as a whole. The district court ably summarized the evidence introduced at trial suggesting that the victim had been raped:

> [T]he evidence of sexual abuse was substantial and apparent to everyone. It is obvious that the motive of this crime was not simply robbery. Roberts was alone in a darkened parking lot early on a Sunday morning when she was accosted. She was nevertheless abducted and taken to Smith's apartment. Her sweater and her purse were found on his bed. Her body was found with her pants unbuttoned, her shirt on inside out and her brassiere pulled out of place. Hairs similar to her head and pubic hair were found on Smith's bed. A Negroid pubic hair similar to Smith's was found in her pubic combings. The implications of this evidence were obvious to the jury.

689 F.Supp. at 660.

At sentencing the prosecution initiated its case by presenting the testimony of the forensic pathologist and the serologist; after unsuccessful objection and an effective cross-examination of the serologist by Smith's trial counsel, the state was left with evidence of recent sexual intercourse involving the victim. The sum of its proof, then, amounted to evidence of an abduction, the likely complete or partial disrobing of her body, including the possible exposure of her breasts and vagina, the likely placement of her nude body on Smith's bed, likely pubic contact between the victim and Smith, and recent sexual intercourse involving the victim. Smith murdered the victim, as the jury concluded at the guilt phase, and there was no suggestion by either side during the guilt or punishment phases that more than one perpetrator had been involved in the victim's abduction and death.[6] In closing arguments the prosecution argued that Smith had raped the victim, once suggesting that "we don't know how many times," but citing the serolo-

---

**6.** In *McFee v. State,* the Mississippi Supreme Court upheld a conviction for rape based in part on a similarly inconclusive typing of pubic hair, explaining that "[i]t may well be, as defense counsel argue, that there are many other men whose pubic hairs possess the same characteristics as that found on the victim's body; yet, there is no evidence in the record that any of those others were present in her home on the morning [in question]." 511 So.2d 130, 134 (Miss.1987).

**974**

gist's testimony that numerous sperm cells were present in the victim's vagina.

We cannot conclude that the prosecution's conduct at the punishment phase was sufficiently improper to warrant vacating Smith's sentence under *Felde.* The suggestion of rape came before the jury during the guilt phase, *see Byrne v. Butler,* 845 F.2d 501, 511 (5th Cir.1988), and the subsequent argument to the jury at the punishment phase fell within the latitude afforded closing argument reasonably premised on physical evidence and witness testimony. *See, e.g., Mattheson v. King,* 751 F.2d 1432, 1445–46 (5th Cir.1985), *cert. dismissed as moot,* 475 U.S. 1138, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986); *Whittington v. Estelle,* 704 F.2d 1418, 1423 (5th Cir.), *cert. denied,* 464 U.S. 983, 104 S.Ct. 428, 78 L.Ed.2d 361 (1983); *Tijerina v. Estelle,* 692 F.2d 3, 7 (5th Cir.1982). Although the evidence did not reasonably suggest that Smith had been raped more than once, the prosecution only indirectly suggested that the evidence indicated as much, and such an inaccuracy cannot be said to have constituted prosecutorial misconduct. *See Jones v. Butler,* 864 F.2d at 357–58; *Lanier v. State,* 533 So.2d at 483; *Cannon v. State,* 190 So.2d at 851.

Given this conclusion, we need not assess the effect of the prosecution's conduct on the outcome of the punishment phase. We note, however, that the pathologist testified without contradiction to the period of suffering incurred by the victim in dying by manual strangulation, and that the prosecution repeatedly emphasized in its closing arguments at the punishment phase the necessarily intentional and agonizing manner of her death and the means by which her body was disposed. This evidence and argument tended to support the jury's conclusion that the murder was especially heinous, atrocious, or cruel, and thereby buttressed any conclusion it might have reached based on evidence of rape.[7]

*E. Ineffective Assistance Of Counsel*

Smith alleges that he was denied effective assistance of counsel in violation of the sixth amendment, specifically indicating the following errors committed by his trial counsel in his brief before this court: "[l]ack of investigation," "[f]ailure to protect Smith's Fifth Amendment rights," "[l]ack of preparation for expert testimony," "[f]ailure to rehabilitate jurors opposed to the death sentence," "[a]llowing Smith to be dressed in prison garb, rather than regular clothes, throughout trial," "[f]ailure to present mitigating evidence," and "[f]ailure to object or preserve errors for review." Smith does not appear to press other instances that he argued before the district court, including tactical error with regard to the presence of witnesses for the defense during the identification testimony of Thomas and Wells and failure to prepare adequately for a motion for change of venue, but does contend that the sum of counsel's errors amounts to a violation of his constitutional rights.

In *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the Supreme Court described the two components necessary for a convicted defendant to claim that she or he was denied the "reasonably effective assistance of counsel" guaranteed by the sixth amendment:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

As implied by the above procedure, "[j]udicial scrutiny of counsel's performance must be highly deferential.... Because of the difficulties inherent in making the evalua-

7. We consider below, in section F, Smith's separate objection to the constitutionality of the "es-

pecially heinous" aggravating circumstance.

tion, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. at 2065. Toward that end, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

 Smith makes two arguments that address generally his claim of ineffective assistance. First, he argues that the district court improperly denied an opportunity to conduct discovery or hold a hearing at which Smith's trial counsel could be compelled to testify. *Strickland* counseled against "second trial[s]" reviewing "counsel's unsuccessful defense," *id.* at 690, 104 S.Ct. at 2066, and Smith fails to allege conduct that cannot be evaluated on the basis of the record. *See Celestine v. Blackburn,* 750 F.2d 353, 358 (5th Cir. 1984), *cert. denied,* 472 U.S. 1022, 105 S.Ct. 3490, 87 L.Ed.2d 624 (1985); *Baldwin v. Maggio,* 704 F.2d 1325, 1328–29 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2669, 81 L.Ed.2d 374 (1984). Indeed, part of Smith's litany of error is composed of mid-trial confessions of error by his trial counsel. Simply stating an interest in explanations for defense counsel's alleged errors is not sufficient to overcome the trial court's discretion in deciding whether or not to hold a hearing. *Daigre v. Maggio,* 705 F.2d 786, 787–88 (5th Cir.1983). To the extent that specific inquiries might be made at such a hearing, the need for a hearing would still be measured by the potential impact of the suggested findings, which we evaluate below in the context of the specific ineffective assistance claims.

Second, Smith appears to suggest that defense counsel's lack of experience in capital cases, his attempt to try the case by himself, and his admitted lack of resources to investigate the case constituted ineffectiveness *per se,* citing *King v. Strickland,*

748 F.2d 1462, 1464 (11th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985), and *Kemp v. Leggett,* 635 F.2d 453, 454 (5th Cir. Unit B 1981) (per curiam), as well as secondary materials. Both *King* and *Kemp* consider specific allegations of error, as must this court. *United States v. Cronic,* 466 U.S. 648, 663–67, 104 S.Ct. 2039, 2049–51, 80 L.Ed.2d 657 (1984) (counsel's preparation time, youth, and dearth of experience in criminal or jury work must be supplemented by indication of specific errors for ineffective assistance claim); *Daniels v. Maggio,* 669 F.2d 1075, 1082 (5th Cir.), *cert. denied,* 459 U.S. 968, 103 S.Ct. 295, 74 L.Ed.2d 278 (1982) (same).

 Although no "evidentiary hearing" was conducted by the district court or by the state court on direct or collateral review, this court may be entitled to presume correctness of the state court's determination on Smith's presentation of the ineffective counsel allegations. *Smith v. State,* 434 So.2d at 218–20; *see Sumner v. Mata,* 449 U.S. at 546–47, 101 S.Ct. at 768–69; *Buxton v. Lynaugh,* 879 F.2d at 142–47; *Smith v. Estelle,* 711 F.2d 677, 681 (5th Cir.1983), *cert. denied,* 466 U.S. 906, 104 S.Ct. 1685, 80 L.Ed.2d 159 (1984). In reviewing Smith's first petition for a writ of error coram nobis, the Mississippi Supreme Court observed that Smith had failed to comply with the requisite steps for an evidentiary hearing on ineffective counsel and had alleged no facts external to the record, then held:

[W]e are compelled to conclude that Smith has in effect stipulated that the ineffective assistance of counsel claim which he propounds may be determined strictly from an examination and review of the record itself. This being so, we are likewise compelled to conclude that this issue has been previously adjudicated. In our original opinion in Smith's direct appeal we held: "At the trial the defendant was ably defended by astute counsel retained by his family." Our review of the case at that time (so far as the record shows) pursuant to our statutorily imposed duty of review in a death penalty case convinced us of such able

and competent efforts on the part of Smith's defense counsel. In the absence of any specific allegations of fact which do not appear within the trial record itself, Smith's claim of ineffective assistance of counsel has been previously adjudicated and is therefore barred from consideration. *Wheat v. Thigpen, supra.* 434 So.2d at 219–20.

The statutory minima for direct review by the Mississippi Supreme Court do not facially require scrutiny of counsel's performance, and the glancing praise for defense counsel offered on direct review is constitutionally remote from a prior determination on the merits of the claim. In essence, the Mississippi Supreme Court held that because Smith failed to satisfy the requirements for a post-conviction evidentiary hearing on the ineffective assistance claim, and did not allege "new" facts external to the record, he was foreclosed from obtaining any collateral review. There is no indication that Smith presented the ineffective assistance claim during direct review, perhaps in part because one of his counsel on appeal was his trial counsel, and the absence of any trial, direct review, or collateral review of the claim denies the presence of "a full, fair, and adequate hearing in the State court proceeding." Accordingly, this court will review the record independent of the appraisal of the Mississippi Supreme Court. 28 U.S.C. § 2254(d)(6); *see Campbell v. Minnesota,* 487 F.2d 1, 4 (8th Cir.1973), *cited with approval in Buxton v. Lynaugh,* 879 F.2d at 145–46.[8] Moreover, since the issue of whether a defendant has received effective assistance of counsel is a mixed question of law and fact, we are free to substitute our judgment for that of the district court. *Vela v. Estelle,* 708 F.2d 954, 960–61 (5th Cir.1983), *cert. denied,* 464 U.S. 1053, 104 S.Ct. 736, 79 L.Ed.2d 195 (1984).

### 1. Lack of Investigation

Smith states that his trial counsel "did not investigate the State's experts, did not investigate the facts, and did not prepare a significant mitigation case." Smith suggests that defense counsel did not investigate the state's experts' qualifications or areas of expertise, did not retain experts of his own, prepared only briefly by interviewing the state's experts before their direct testimony, and did not attack the medical testimony in the sentencing hearing. Smith does not suggest deficiencies in the aforesaid qualifications or areas of expertise; on the face of it the state's experts appear to have been qualified to provide the testimony they did, and the trial judge sharply rejected defense counsel's attempt to resist the pathologist's qualification as an expert witness, stating that "as far as I know, Dr. Galvez has been the only pathologist that has testified in this court in the three and a half years that I have been hearing cases and it's surprising that anyone doesn't know his qualifications." Moreover, Smith previously contended that he was denied the *opportunity* to prepare by the lack of notice regarding the identity of the state's experts, a claim deemed procedurally barred by the Mississippi Supreme Court. 434 So.2d at 218.

At sentencing, the defense did not offer counter-experts, but established doubt as to the conclusiveness of the medical conclusions on cross-examination. Smith specifically alleges that his counsel was ineffective in indicting the pathologist's conclusion that the victim was killed by manual strangulation, and refers to an expert's affidavit offered to the district court below which concluded that the autopsy report did not definitively exclude other causes of death. Assuming defense counsel should have further impeached the manual strangulation hypothesis, it is unlikely that the error changed the result of either phase, given the relative violence of the rival explanations for the victim's demise and the emphasis on the rape allegation in prosecution of the "especially heinous" aggravating circumstance.

---

8. In any event, this court is not bound by the Mississippi Supreme Court's determination that the claim is procedurally barred. Mississippi law recognizes that ineffective assistance claims need not be preserved at trial, *Read v. State,* 430 So.2d 832, 836–38 (Miss.1983), and Smith could not have procedurally defaulted on his claim by failing to raise it on direct review. *See supra.*

 The claim that defense counsel did not "investigate the facts" is belied by numerous instances of sleuthing found in the record. Similarly, the claim that counsel failed to present a significant mitigation case is contradicted by his performance during the sentencing phase, at which he called five witnesses to testify to Smith's character and plead against imposition of the death penalty. It is not enough to allege a general failure to produce sufficient mitigation; rather, a petitioner must "specify what other mitigating evidence was available or how that evidence could have affected the jury's decision." *Sawyer v. Butler*, 848 F.2d 582, 592 (5th Cir.1988), *aff'd in part on rehearing en banc*, 881 F.2d 1273, 1276, *aff'd sub nom. Sawyer v. Smith*, — U.S. ——, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990); *Byrne v. Butler*, 845 F.2d at 517. While it is conceivable that some other mitigating evidence might have been presented, it is equally possible that Smith's trial counsel had sound strategic reasons for not presenting it, and we cannot speculate that Smith was unconstitutionally impaired by any ineffective assistance on such an allegation. *See Prejean v. Smith*, 889 F.2d 1391, 1398–99 (5th Cir. 1989), *cert. denied*, — U.S. ——, 110 S.Ct. 1836, 108 L.Ed.2d 964 (1990); *McCoy v. Lynaugh*, 874 F.2d 954, 964 (5th Cir.1989); *Stringer v. Jackson*, 862 F.2d at 1116.

Smith's mitigation argument reduces to the complaint that his trial counsel failed to indicate to the jury Smith's low intelligence. In *Jones v. Thigpen*, 788 F.2d 1101, 1102–03 (5th Cir.1986), this court found constitutionally ineffective the failure of counsel to present any mitigation evidence when a habeas hearing in federal district court demonstrated that witnesses for the state *and* defense agreed that the petitioner was mentally retarded, with a tested full scale I.Q. of less than 41. Trial counsel for Jones also failed to present proof of the

petitioner's youth (seventeen at the time of the crime), and did not present the mitigating circumstance that there was no evidence of intent or indeed of any direct role by the petitioner in the homicide. In the instant case, Smith offered the district court below an undisputed affidavit citing a tested full scale I.Q. of 70, on the upper borderline of mild retardation, and opining that Smith's abilities were inconsistent with the capacity to commit the crime for which he was convicted and inconsistent with the ability to cooperate effectively in his own defense. Although the failure to present any evidence regarding Smith's intelligence is not obviously the result of strategic choice, *compare Bell v. Lynaugh*, 828 F.2d 1085, 1088–91 (5th Cir.1987), *cert. denied*, 484 U.S. 933, 108 S.Ct. 310, 98 L.Ed.2d 268 (1987), Smith's circumstances differ from those considered in *Jones v. Thigpen* and kindred cases. Smith had already testified before the jury,[9] thereby providing them with an opportunity to form their own opinions regarding his capabilities and capacity, and had a mitigation case presented on his behalf. The jury was presented with eyewitness testimony,[10] allegations of rape, and found two aggravating circumstances that are not presented for review by this petition.

 The likely impact of testimony regarding Smith's intelligence, moreover, would have been tempered by his trial strategy of insisting on his complete innocence and ignorance of the crime, a theory that also proved the linchpin of the mitigation case offered at the punishment phase and indeed comprised the central argument of each witness for the defense at that phase. There is no suggestion that Smith's alleged deficiencies were such as necessarily to alert defense counsel to the inferiority of such a strategy. *Cf. Byrne v. Butler*, 845 F.2d at 513. Finally, Smith's alleged deficiencies do not include any signif-

---

9. There is no indication that the petitioner in *Jones v. Thigpen* testified at trial. *See Jones v. Thigpen*, 555 F.Supp. 870 (S.D.Miss.1983), *aff'd in part and rev'd in part*, 741 F.2d 805 (5th Cir.1984), *vacated*, 475 U.S. 1003, 106 S.Ct. 1172, 89 L.Ed.2d 292 (1986), *aff'd on remand*, 788 F.2d 1101 (5th Cir.1986); *Jones v. State*, 381 So.2d 983 (Miss.), *cert. denied*, 449 U.S. 1003, 101 S.Ct. 543, 66 L.Ed.2d 300 (1980).

10. *Contrast Jones v. Thigpen*, 741 F.2d at 807 ("[t]his is a classic case of a felony murder with no eyewitnesses").

icant organic damage. or mental illness. *Contrast Wilson v. Butler,* 813 F.2d 664, 668–73 (5th Cir.), *modified on reh'ng,* 825 F.2d 879 (5th Cir.1987), *cert. denied,* 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988). Smith's claim neither presents a sufficient deficiency nor consequent prejudice to support a finding of constitutionally ineffective assistance of counsel. *See, e.g., Glass v. Blackburn,* 791 F.2d 1165, 1170–71 (5th Cir.1986), *cert. denied,* 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987); *Celestine v. Blackburn,* 750 F.2d 353, 356–58 (5th Cir.1984).

### 2. Failure to Protect Smith's Fifth Amendment Rights

 At the suppression hearing challenging certain warrantless searches, Smith was questioned by his counsel for the limited purposes of proving possession of the apartment and lack of consent. On cross-examination the prosecutor questioned Smith about a number of unrelated matters, discussing virtually every major aspect of Smith's account of his activities on the day in question, including his alibi.

Contrary to Smith's argument on appeal, defense counsel objected not once, but five times, to the scope of cross-examination on the motion to suppress, and was upheld three times. The prosecution later used material derived from earlier cross-examination at trial to establish that Smith had said nothing about having marijuana in his car, to establish some tension between Smith's stated concern that persons might have been in his house and his stated concern for delivering a package to the hospital, to establish that Smith had earlier been able to recall the time he had returned from his party, and to establish confusion over whether he could tell from which direction the shadow he observed had proceeded. In fact, counsel objected at the suppression hearing to questions regarding the package and to questions regarding the shadow, and was sustained on both objections; if anything, his failure was more acute at the later cross-examination, but the effect of the casual impeachment was inconsequential. Smith neither demonstrates a sufficient deficiency nor consequent prejudice sufficient to independently support an ineffective assistance finding.[11]

### 3. Lack of Preparation for Expert Testimony

Smith's claim that defense counsel was ineffective for failing to prepare for expert testimony falls short of establishing constitutional error for the same reasons discussed above in connection with the "lack of investigation" complaint.

### 4. Failure to rehabilitate jurors opposed to the Death Sentence

 Smith briefly notes that his counsel failed to attempt to rehabilitate any potential jurors who were challenged on *Witherspoon* grounds, *Witherspoon v. Illinois,* 391 U.S. 510, 521–22, 88 S.Ct. 1770, 1776–77, 20 L.Ed.2d 776 (1968); *see Goodwin v. Balkcom,* 684 F.2d 794, 814–17 (11th Cir.1982), *cert. denied,* 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983); and cites the opinion of Professor Goodpaster that "[c]ounsel's failure to attempt to qualify death-scrupled jurors constitutes a ... category of inherently prejudicial ineffectiveness." Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 N.Y.U.L.Rev. 299, 351 (1983).

Unlike *Goodwin v. Balkcom,* each juror excluded for cause here had made unmistakably clear that they could not vote for the infliction of the death penalty. As in *Goodwin,* certain jurors responded to the question of whether they were against the death penalty even under circumstances when the law and testimony warranted it merely by indicating with a raised hand or other physical gesture their agreement. Neither the form of the question nor the ambiguous means of indicating assent necessarily complies with the strict requisites

---

**11.** *United States v. Frappier,* 615 F.Supp. 51, 52–53 (D.Mass.1985), is easily distinguished. There one aspect of counsel's ineffectiveness was his advising the defendant to take the stand at a detention hearing when federal statutory law specifically permitted him to present testimony by proffer at that proceeding.

of *Witherspoon.* *See, e.g., Goodwin,* 684 F.2d at 815; *Granviel v. Estelle,* 655 F.2d 673, 677–78 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). However, *Witherspoon* is also satisfied by a jury's unmistakably clear indications "that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt."* 391 U.S. at 522 n. 21; 88 S.Ct. at 1777 n. 21 (emphasis in original). Here, the judge directed the following question to those jurors indicating that they had conscientious scruples against the death penalty:

> Could you nevertheless follow the testimony and the instructions of the court and return a verdict of guilty although that verdict could result in the death penalty if you, being the judges of the weight and the worth of the evidence, were convinced of the guilt of the defendant and the circumstances warranted such a verdict?

Each juror responded clearly and unmistakably. The question and the means of answer satisfy *Witherspoon* and the issue of counsel's ineffectiveness.

### 5. Allowing Smith to Be Dressed in Prison Garb Throughout Trial

■■■ Smith, again briefly, alleges that defense counsel allowed Smith to "appear at trial in the distinctive blue jumpsuit of a prisoner, rather than regular clothes," and offers as proof counsel's description of Smith as being in a "blue jumpsuit" during his cross-examination of Wells, one of the eyewitnesses. TR 647–48. Smith's allegation must amount to a claim of ineffectiveness for failing to object to Smith's dress, as *Estelle v. Williams* is clear that failure to make a contemporaneous objection to the defendant's appearance "is sufficient to negate the presence of compulsion sufficient necessary to establish a constitutional violation." 425 U.S. 501, 513, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126 (1976). Assuming the blue jumpsuit was prison garb, counsel's conduct cannot be gainsaid as an inappropriate legal strategy. Although the record is not clear whether Smith wore the jumpsuit on other occasions, it is clear that it was effective for the defense on the occasion cited by Smith as proof: the defense was able to call into question the in-court identification of Smith by Wells by demonstrating how obvious his choice must have been. Such conduct falls well within the strong presumption of sound trial strategy required by *Strickland.* 466 U.S. at 689, 104 S.Ct. at 2065.

### 6. Failure to Present Mitigating Evidence

Smith's claim that defense counsel was ineffective for failing to present mitigating evidence falls short of establishing constitutional error for the same reasons discussed above in connection with his claim of ineffectiveness for failure to prepare a significant mitigation case.

### 7. Failure to Object or Preserve Errors for Review

■■■ Smith claims that defense counsel committed fundamental error by failing to object to "the prosecutor's illegal use of its peremptory challenges to strike blacks from the jury, the cross-examination of the defendant at the suppression hearing, and the improper and inflammatory closing argument of the prosecutor," and the prosecutor's repeated arguments in closing that the jury should take into account the possibility of parole in determining whether to sentence Smith to death. As previously discussed, counsel did object several times during cross-examination of Smith at the suppression, as did he during the closing argument at the sentencing phase. Smith does not provide any specific complaints regarding important passages to which counsel should have additionally objected, and his claim fails for that reason.

Smith's objection to defense counsel's failure to contemporaneously object to the prosecution's use of peremptory challenges stutter-steps at the next argument in his appellate brief, in which he attempts to excuse his procedural default of the *Batson* claim by citing as "cause" the fact that the district attorney's systematic discrimination did not emerge until 1985. This

tension is not resolved by the ultimate failure of his procedural default argument, and the ineffective assistance aspect fails for reasons derived from the failure of the *Batson* claim, discussed below.

■ Finally, Smith objects to his counsel's failure to object to the prosecutor's repeated references to the possibility of "ten years on parole," but underestimates the complexity of this claim. The prosecutor's remarks were permissible, in part because the defense's closing put into issue Smith's understanding of his expected prison term, thereby "opening the door" to otherwise impermissible remarks by the prosecutor. *Gilliard v. State,* 428 So.2d 576, 583–84 (Miss.), *cert. denied,* 464 U.S. 867, 104 S.Ct. 40, 78 L.Ed.2d 179 (1983). The defense closing, in turn, was a rational tactic designed to defuse a damaging cross-examination of his client at the sentencing phase, when Smith stated that he had been told he would get out in ten years if given a life sentence, and the scope of cross-examination was itself arguably justified by the direct examination of Smith on his understanding of the alternative sentences open to the jury. Defense counsel's original questions no doubt initiated a chain of events which from Smith's perspective were untoward. However, viewed in the full context of the sentencing phase, it is difficult to conclude that defense counsel's original error and its legacy were sufficiently ineffective and prejudicial to change the outcome of the proceeding. Addressing a very similar claim in *Gilliard v. Scroggy,* 847 F.2d 1141, 1147–48 (5th Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989), this court stated:

> We agree that *Caldwell [v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)]* directs prosecutors to provide accurate and non-misleading information. We are not persuaded, however, that in this case the prosecutor's information was inaccurate or misleading. The prosecutor said "life is ten years and you are then eligible for parole." This statement, while obviously not a full explanation of Mississippi's system of parole, is an accurate thumbnail statement of the law, absent evidence of two or more prior felony convictions. Miss. Code Ann. § 47–7–3; cf. Miss.Code Ann. § 99–19–81 (Mississippi's habitual offender sentencing statute). We cannot conclude that the remarks created an unacceptable risk that the jury would mete out the death penalty arbitrarily or capriciously. Gilliard is not entitled to a new sentencing hearing.

■ While Smith may be correct in chastising his trial counsel for not objecting on certain occasions and in arguing that Smith was thereby prejudiced, Smith's claims simply fail to establish a possibility that the outcome would be different, either independently or in combination with his other ineffective assistance claims. While it is true that a failure to object properly or to preserve fundamental errors at trial may constitute ineffective assistance, *see, e.g., Vela v. Estelle,* 708 F.2d at 960–61, the standard under *Strickland* ultimately diverts attention from legal error to assessing the probability that the outcome of the proceeding would have been different. Certainly counsel's performance was suboptimal in certain respects, even jarring: he asked the court to grant Smith's wish that counsel's son, not a lawyer, conduct the closing at the sentencing phase, and his own closings in both phases were in large part apologies for his own involvement in the case. Such expressions of reluctance may be constitutionally suspect. *King v. Strickland,* 748 F.2d 1462, 1464 (11th Cir. 1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985). However, in light of the fact that his individual or sum failings do not appear in reasonable probability to have contributed to a different outcome at the guilt or sentencing phases, his claim of ineffective assistance of counsel does not warrant relief.

F. *Unconstitutionality of Mississippi's "Especially Heinous, Atrocious or Cruel" Aggravating Circumstance*

Smith argued in his original appellate brief that his sentence was unconstitutionally imposed because the jury considered the aggravating circumstance of "espe-

cially heinous, atrocious or cruel" as one of three aggravating circumstances. Smith's jury was instructed to weigh against them certain specified mitigating circumstances as well as "[a]ny and all other matters, facts and circumstances which you as jurors may consider from the evidence as mitigating," "[a]ny circumstance or combination of circumstances surrounding the defendant's life and character which reasonably mitigates against imposition of the death penalty," and "[a]ny circumstance or combination of circumstances surrounding the offense which reasonably mitigates against imposition of the death penalty." In returning its sentencing verdict, the jury did not address the presence of mitigating circumstances except to observe that they were outweighed by its finding of all three aggravating circumstances, including the "especially heinous" circumstance.

Smith argued that his sentencing violated *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), which had invalidated use of an "indistinguishable" Oklahoma statute under *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Smith recognized that his argument was in tension with *Stringer v. Jackson*, 862 F.2d 1108 (5th Cir.1988), which had recognized the Mississippi practice of upholding sentences when at least one valid aggravating circumstance remained, but argued that that decision misapprehended Mississippi law. Smith further argued that the removal of an invalid aggravating circumstance had a particularly significant effect when a jury was authorized, as in Mississippi, to weigh aggravating against mitigating circumstances.

The state, in response, recalled the district court's observation that the relevant claims were not "raised at trial or on direct appeal, and they are procedurally barred." 689 F.Supp. at 662–63. The Mississippi Supreme Court had previously on collateral review held the claim barred, seemingly because it was not raised by contemporaneous objection at trial or on direct appeal. 434 So.2d at 218. (The court's opinion is ambiguous only as to whether it regarded the claim to be barred independently for failure to object at trial.) The state also noted that *Stringer* and post-*Maynard* Mississippi cases held that the invalidity of one aggravating circumstance among many was not enough to require reversal of the sentence. In supplemental briefs, Smith argues that *Clemons v. Mississippi*, —— U.S. ——, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), forbids automatic affirmance on the basis of at least one valid aggravating circumstance in those states which weigh aggravating against mitigating circumstances, suggesting that this dissolves the only objection on the merits to his *Maynard* claim. The state has continued to insist that Smith's claim is procedurally barred. Because the nature of Smith's claims raised the issue of whether his relief relied on "new" rules that could not be applied on collateral review, we requested that the parties file still more supplemental briefs on the issues spawned by *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).[12]

### 1. Priority of the Nonretroactivity Inquiry

The first concern is whether Smith is entitled to the application of the rules described by *Maynard* and *Clemons*, given that they might qualify as "new" rules

---

**12.** After *Teague*, which *sua sponte* considered the nonretroactivity issue based on the suggestion of an amicus brief, 109 S.Ct. at 1069, circuit courts have split as to the appropriateness of considering *Teague* limitations without the issue having been raised by the parties. *Compare, e.g., Hill v. McMackin*, 893 F.2d 810, 813 (6th Cir.1989) (deciding application of *Teague*) *with Hanrahan v. Greer*, 896 F.2d 241, 245 (7th Cir. 1990). The Fifth Circuit has not explicitly confronted the issue. Given *Teague* itself and the subsequent *sua sponte* resolution of *Saffle v.*

*Parks*, —— U.S. ——, 110 S.Ct. 1257, 1264 n. 1, 108 L.Ed.2d 415 (1990) (Brennan, J., dissenting), we believe the better choice is to reach the *Teague* issue now pressed by the State. *Compare Collins v. Youngblood*, —— U.S. ——, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (declining to reach *Teague* question abjured by counsel for state); *Patsy v. Board of Regents of Fla.*, 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567 n. 19, 73 L.Ed.2d 172 (1982) (complying with request of state to pass on potential Eleventh Amendment issue).

under the nonretroactivity doctrine of *Teague v. Lane.* *Teague* declared that a constitutional rule which "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not *"dictated* by precedent existing at the time the defendant's conviction became final"[13] would not be applied to cases on collateral review unless the rule falls within at least one of two narrow exceptions. *Id.* at 1070 (emphasis in original). In further explicating the determination of such rules, *Butler v. McKellar* suggested a "functional view" of newness in declaring that " '[t]he "new rule" principle therefore validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions.' " *Saffle v. Parks,* — U.S. —, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990) (quoting *Butler v. McKellar,* — U.S. —, —, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990)). In *Saffle* and earlier in *Penry v. Lynaugh,* — U.S. —, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the Supreme Court applied *Teague*'s nonretroactivity principle to the collateral review of capital cases presenting eighth amendment challenges to sentencing.

We initially confront the question of the primacy of *Teague* questions. No case among the Supreme Court quartet has spoken directly to the proper order of consider both *Teague* and procedural default issues are raised: although *Teague* and each successive case has spoken of nonretroactivity as a "threshold" issue, *e.g.,* 109 S.Ct. at 1069, it is arguable that the "threshold" is relative to the application or statement of the new rule, not to other means of denying relief to the petitioner. The practice of courts considering both *Teague* and procedural default arguments against a petitioner's claim has been varied, albeit without explicit acknowledgment of the choice. In *Butler v. McKellar,* the Court solely considered the *Teague* issue despite the respondents' contention that the same claim was barred because of a state procedural default. *See* Brief of Respondents, *Butler v. McKellar,* — U.S. —, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990); Reply Brief for Petitioners, *Butler v. McKellar,* — U.S. —, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990). On other occasions courts have considered *Teague* objections before procedural default issues, *United States v. France,* 886 F.2d 223, 226–228 (9th Cir. 1989), *cert. granted,* — U.S. —, 110 S.Ct. 1921, 109 L.Ed.2d 285 (1990), but have also pursued the opposite tack in identical situations. *See United States v. Makaweo,* 730 F.Supp. 1016 (D.Hawaii 1990); *United States v. Rubio,* 722 F.Supp. 77, 82–86 (D.Del.1989) (alternative holding). In the analogous pairing of *Teague* and writ abuse issues, the writ abuse issues have thus far been considered first. *Collins v. Zant,* 892 F.2d 1502, 1510–12 (11th Cir. 1990); *Moore v. Zant,* 885 F.2d 1497, 1502–03 (11th Cir.1989) (plurality opinion of en banc court), *cert. denied,* — U.S. —, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990); *but see Clark v. Dugger,* 901 F.2d 908 (11th Cir. 1990) (questioning practice).

The Fifth Circuit has only combined the issues in what are apparently alternative holdings. *Hill v. Black,* 887 F.2d 513, 518 (5th Cir.1989), *reh'g denied,* 891 F.2d 89 (5th Cir.1989). However, our best reading of the Supreme Court's intimations on the priority of *Teague* issues leads us to conclude that the better practice is to engage first in an analysis of the "newness" of Smith's requested rule.

2. Nonretroactivity of the Maynard/Clemons Claim

The *Maynard v. Cartwright* opinion suggested that the result in that case was dictated by *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), stating forthrightly that *"Godfrey* controls this case." 486 U.S. at 363, 108 S.Ct. at 1859. The Court reasoned that the language of the Oklahoma aggravating circumstance at issue—like that of Mississippi, addressing crimes "especially heinous,

---

**13.** Smith's conviction became final on March 21, 1983, when the Supreme Court denied his application for writ of certiorari to review the Mississippi Supreme Court's denial of his direct appeal. 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983).

atrocious, or cruel"—"gave no more guidance than the 'outrageously or wantonly vile, horrible or inhuman' language that the jury returned in its verdict in *Godfrey.*" Second, the Court observed, the conclusion of the Oklahoma court that certain facts " 'adequately supported the jury's finding' was indistinguishable from the action of the Georgia court in *Godfrey,* which failed to cure the unfettered discretion of the jury and to satisfy the commands of the Eighth Amendment." 486 U.S. at 363, 108 S.Ct. at 1859.

The Supreme Court, of course, has cautioned against using the rhetoric of opinions to determine whether they articulate "new" law under *Teague, see Butler v. McKellar,* — U.S. at ——, 110 S.Ct. at 1217, and indeed has suggested that it is not enough to find that prior decisions "inform, or even control or govern, the analysis of [the] claim," unless they can be said to *"compel* the rule that [the petitioner] seeks." *Saffle v. Parks,* — U.S. at ——, 110 S.Ct. at 1261 (emphasis added). We need not focus on Smith's eligibility for the application of *Maynard,* however,[14] because an essential element to his claim relies on the rule propagated on direct appeal in *Clemons v. Mississippi.* Although Mississippi did not in fact rely on this "one is enough" basis for affirming his sentence, perhaps in part because no claim was presented to that court on direct review, and because it deemed the claim procedurally barred on direct review, we regard constitutional rejection of this practice as a necessary component to Smith's claim on appeal.[15]

*Clemons* rejected the contention that a Mississippi sentence partially predicated on an invalid aggravating circumstance must as a constitutional matter be vacated and remanded to a sentencing jury, but also limited for the first time Mississippi's practice of supporting a death sentence on the basis of a remaining, valid aggravating factor. The Court found that despite recitation of the proper limiting construction of the "especially heinous" aggravating factor, examination of the facts underlying sentencing, and the suggestion that the " 'punishment of death is not too great when the aggravating and mitigating circumstances are weighed against each other,' " the Mississippi Supreme Court's reference to its practice

... can be read as a rule authorizing or requiring affirmance of a death sentence so long as there remains at least one valid aggravating circumstance. If that is what the Mississippi Supreme Court meant, then it was not conducting appellate reweighing as we understand the concept. An automatic rule of affirmance in a weighing State would be invalid under *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), for it would not give defendants the individual-

**14.** Consequently, we neither agree nor disagree with the conclusion of the Eighth Circuit that *Maynard* did not represent a new rule for *Teague* purposes. *Newlon v. Armontrout,* 885 F.2d 1328, 1333 (8th Cir.1989), *petition for cert. filed,* No. 89–1372 (Feb. 13, 1990). It is symptomatic of the difficulty of *Teague* issues, however, that the Tenth Circuit manifestly regarded its underlying decision in *Cartwright v. Maynard,* 822 F.2d 1477 (10th Cir.1987) (en banc) as new. *See Coleman v. Saffle,* 869 F.2d 1377, 1381 (10th Cir.1989) ("It cannot reasonably be disputed that our decision in *Cartwright* was a new and significant development in Oklahoma law"), *cert. denied,* — U.S. ——, 110 S.Ct. 1835, 108 L.Ed.2d 964 (1990); *Cartwright v. Maynard,* 822 F.2d at 1482 ("We agree that '*Zant [v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) ] and *Barclay* leave open the question of whether a sentencing authority that must weigh all statutory factors may consider constitution-

ally invalid aggravating circumstances.' Special Project, *Capital Punishment in 1984: Abandoning the Pursuit of Fairness and Consistency,* 69 Cornell L.Rev. 1129, 1181 (1984).").

**15.** Each of the three Fifth Circuit cases relying on the Mississippi practice as a defense against like claims have also invoked the practice for the first time in federal court. *Compare Hill,* 891 F.2d at 90 *and Stringer,* 862 F.2d at 1113–15 *and Edwards,* 849 F.2d 204, 211 n. 7 (5th Cir. 1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1328, 103 L.Ed.2d 597 (1989) *with In re Hill,* 460 So.2d 792, 800 (Miss.1984) *and Stringer v. State,* 485 So.2d 274, 275 (Miss.1986) *and Edwards v. Thigpen,* 433 So.2d 906, 909 (Miss.1983). In the district court below the Mississippi practice was invoked as one basis for rejecting a different objection to the sentencing process. 689 F.Supp. at 660.

ized treatment that would result from actual reweighing of the mix of mitigating and aggravating circumstances. *Cf. Barclay v. Florida,* 463 U.S. 939, 958, 103 S.Ct. 3418, 3429, 77 L.Ed.2d 1134 (1983). Additionally, because the Mississippi Supreme Court's opinion is virtually silent with respect to the particulars of the allegedly mitigating evidence presented by Clemons to the jury, we cannot be sure that the court fully heeded our cases emphasizing the importance of the sentencer's consideration of a defendant's mitigating evidence. We must, therefore, vacate the judgment below, and remand for further proceedings, insofar as the judgment below purported to rely on the State Supreme Court's reweighing of aggravating and mitigating circumstances. *Cf. Cabana v. Bullock,* 474 U.S. [376], at 390–392, 106 S.Ct. [689], at 699–700 [88 L.Ed.2d 704 (1986) ]. —— U.S. at ——, 110 S.Ct. at 1450.

*Saffle's* reading of *Lockett* and *Eddings* stressed that "[t]here is a simple and logical difference between rules that govern what factors the jury must be permitted to consider in making its sentencing decision, and rules that govern how the State may guide the jury in considering and weighing those factors in reaching a decision," and noted that rules regarding *"how* [the jury] must consider the mitigating evidence" were not within the ambit of those cases. —— U.S. at ——, 110 S.Ct. at 1261; *see also Sawyer v. Smith,* —— U.S. ——, ——, 110 S.Ct. 2822, 2828, 111 L.Ed.2d 193 (1990) ("general proposition[s]" divined from *Lockett* and *Eddings* insufficiently determinative for *Teague* test), *aff'g Sawyer v. Butler,* 881 F.2d 1273 (5th Cir.1989) (en banc). Mississippi's practice neither addresses *what* factors the jury may consider, nor, in fact, any consideration by the jury at all; the jury in Smith's case, per instance, was free to consider any statutory or nonstatutory mitigating evidence it chose. Mississippi has simply developed a practice as one component of its review process that ignores invalid aggravating circumstances for the sake of valid ones.

Not until *Clemons v. Mississippi* did the United States Supreme Court specifically apply *Godfrey* and *Maynard* to the Mississippi aggravating circumstance, and before that application it could at least be said that the constitutional practice of Mississippi's redemptive status was ambiguous, making reasonable for *Teague* purposes the rule preceding *Clemons. See Butler,* —— U.S. at ——, 110 S.Ct. at 1217; *Saffle,* —— U.S. at ——, 110 S.Ct. at 1260–61. In *Evans v. Thigpen,* 809 F.2d 239, 241 (5th Cir.)(dicta), *cert. denied,* 483 U.S. 1033, 107 S.Ct. 3278, 97 L.Ed.2d 782 (1987), *Edwards v. Scroggy,* 849 F.2d 204, 211 n. 7 (5th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1328, 103 L.Ed.2d 597 (1989), and most recently in *Stringer v. Jackson,* 862 F.2d 1108, 1113–15 (5th Cir.1988), which the Supreme Court has vacated and remanded for consideration in light of *Clemons v. Mississippi, see* —— U.S. ——, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990), various panels of this court have sustained death sentences premised in part on an invalid aggravating circumstance by recognizing the Mississippi practice of sustaining verdicts when supported by at least one valid aggravating circumstance. Under this practice, perhaps first represented in *Evans v. State,* 422 So.2d 737, 743 (Miss.1982), *cert. denied,* 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 314 (1983), the Mississippi Supreme Court typically would recognize the problematic constitutionality of the "especially heinous, atrocious, or cruel" aggravating circumstance, possibly review the sentence for proportionality and under the *Coleman* limiting construction of the circumstance, and uphold the sentence if in any event the jury had found at least one other valid aggravating circumstance. *See, e.g., Pinkney v. State,* 538 So.2d 329, 355–58 (Miss. 1988), *vacated and remanded for further consideration in light of Clemons v. Mississippi,* —— U.S. ——, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990); *Lanier v. State,* 533 So.2d 473, 491 (Miss.1988) (alternative holding; sentence vacated on other grounds); *Lockett v. State,* 517 So.2d 1317, 1336 (Miss.1987) (alternative holding), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); *Johnson v. State,* 511 So.2d 1333, 1336–39 (Miss.1987) (alternative

holding), *rev'd sub nom. Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988); *Stringer v. State*, 500 So.2d 928, 944–45 (Miss.1986); *Irving v. State*, 498 So.2d 305, 314 (Miss.1986) (alternative holding), 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); *Edwards v. State*, 441 So.2d 84, 92 (Miss.1983) (alternative holding; sentence vacated on divided opinion); *Tokman v. State*, 435 So.2d 664, 670 (Miss.1983) (alternative holding), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984).

This practice relied in part on decisions of the Supreme Court subsequent to *Lockett* and *Eddings* (and subsequent by a matter of months to the point at which Smith's conviction became final) that might with hindsight be read as anticipating *Clemons*, but at the time might have appeared to confirm the constitutionality of the Mississippi practice. *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), upheld a death sentence administered under the Georgia sentencing scheme when one of three aggravating circumstances found by the jury was subsequently held invalid by the Georgia Supreme Court while the other two aggravating circumstances were specifically upheld. Although the opinion recognized the *potential* differences attending a "weighing" state, *id.* at 873 n. 12, 890–91, 103 S.Ct. at 2741 n. 12, 2750, the chief import of the decision was often viewed as confirming the constitutional latitude afforded the common state practice of redeeming death sentences when more than one aggravating circumstance was present, and *Zant* was relied upon by this court and the Mississippi Supreme Court in warranting the Mississippi practice. *See, e.g., Stringer v. Jackson*, 862 F.2d at 1113–14; *Lanier v. State*, 533 So.2d at 491; *Lockett v. State*, 517 So.2d at 1336; *Johnson v. State*, 511 So.2d at 1336–39; *Stringer v. State*, 500 So.2d at 944–45; *Irving v. State*, 498 So.2d at 314.[16] Similarly, while the plurality opinion in *Bar-*

*clay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), might have suggested a reservation regarding certain circumstances in "weighing" states, *see id.* at 954 n. 12, 103 S.Ct. at 3427 n. 12, the opinion also noted that Florida, like Georgia, "requires the sentencer to find at least one valid aggravating circumstance before the death penalty may even be considered," *id.* at 954, 103 S.Ct. at 3427, and ultimately upheld the Florida scheme. Finally, *Maynard v. Cartwright* left to Oklahoma the redetermination of sentence and recognized the possibility that the court "would not necessarily set aside a death penalty where on appeal one of several aggravating circumstances has been found invalid or unsupported by the evidence." 486 U.S. at 365, 108 S.Ct. at 1860.

To the extent that these cases contain reservations distinguishing schemes like that administered by Mississippi, it cannot be said that such distinctions represented legal determinations that control the outcome of Smith's case, and certainly not so for the law applicable at the time his conviction became final. The Supreme Court explicitly acknowledged at a time prior to that date that it would not distinguish between functionally similar sentencing schemes, even if the differences would obviate the potential distinctions marking a "weighing" state. *See Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 2331 n. 12, 101 L.Ed.2d 155 (1988) (citing *Adams v. Texas*, 448 U.S. 38, 46, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)); *see also Stringer v. Jackson*, 862 F.2d at 1115 (opining that there is "no difference, other than one in semantics, between instructing a jury to weigh aggravating against mitigating circumstances in determining the sentence and instructing a jury to consider all aggravating and mitigating circumstances in deciding on the sentence"). Of the large number of cases which have enforced a practice such as that of Mississippi, the majority have ignored fine distinc-

---

**16.** *Butler's* observation regarding the retroactivity of judicial rhetoric is surely appropriate to any effort to locate the distinctions of *Clemons* in *Zant.* In *Johnson v. Mississippi*, for example, the Court stressed its "specific[ ] reli[ance]" in that case on the admissibility of evidence at the sentencing hearing, 486 U.S. 578, 590, n. 9, 108 S.Ct. 1981, 1989 n. 9, 100 L.Ed.2d 575 (1988), a characterization of *Zant* that by itself might well warrant affirming Smith's sentence.

tions among the various states' capital schemes. *See, e.g., Lindsey v. Thigpen,* 875 F.2d 1509, 1515 (11th Cir.1989) (applying Alabama law); *Coleman v. Saffle,* 869 F.2d at 1390 (applying Oklahoma law); *Mercer v. Armontrout,* 844 F.2d 582, 584–85 (8th Cir.1988) (applying Missouri law), *cert. denied,* 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988); *Neuschafer v. Whitley,* 816 F.2d 1390, 1393 (9th Cir.1987) (applying Nevada law); *Baldwin v. State,* 456 So.2d 117, 126–28 (Ala.Crim.App.1983), *aff'd, Ex parte Baldwin,* 456 So.2d 129 (1984), *aff'd, Baldwin v. Alabama,* 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985); *People v. Bittaker,* 48 Cal.3d 1046, 49 Cal.3d 501B, 259 Cal.Rptr. 630, 662, 774 P.2d 659, 691 (1989) cert. denied, — U.S. ——, 110 S.Ct. 2632, 110 L.Ed.2d 651 (1989); *State v. Johns,* 679 S.W.2d 253, 267 (Mo.1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985); *State v. Mercer,* 618 S.W.2d 1, 10 & n. 5 (Mo.) (dicta), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981); *State v. Jones,* 288 S.C. 1, 340 S.E.2d 782, 784 (1985); *Stout v. Commonwealth,* 237 Va. 126, 376 S.E.2d 288, 292 (1989), *cert. denied,* — U.S. ——, 109 S.Ct. 3263, 106 L.Ed.2d 609 (1989).

Rather than allowing the federal judiciary a means of reneging on its commitment to the proposition that there is no "one right way for a State to set up its capital sentencing scheme," *Spaziano v. Florida,* 468 U.S. 447, 464, 104 S.Ct. 3154, 3164, 82 L.Ed.2d 340 (1984), the *Teague* doctrine in part tolerates the diversity of state schemes by accepting the fact that various jurisdictions will not always correctly anticipate the ultimate constitutional significance of every detail. Instead, "reasonable, good-faith interpretations of existing precedents" are sufficient to prevent the application of new law. *Butler,* 110 S.Ct. at 1217; *see also Sawyer v. Smith,* — U.S. at ——, 110 S.Ct. at 2828–29 (incorrect characterization of Supreme Court precedent by Mississippi Supreme Court further indicates extent to which subsequent constitutional ruling was not dictated). We hold, consequently, that the application of *Clemons* to Smith would involve the application of a "new rule" on collateral review, a practice normally barred by *Teague.*

### 3. Exceptions to the *Teague* Rule

■ The general principle that new rules will not be applied to cases on collateral review enjoys two narrow exceptions, but Smith's requested rule is entitled to neither. First, a rule may be applied retroactively if the rule places certain kinds of primary, private individual conduct beyond the power of the state to proscribe, *see Teague,* 489 U.S. at ——, 109 S.Ct. at 1075, or concerns a "substantive categorical guarante[e] accorded by the Constitution," such as a rule "prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Penry,* — U.S. at ——, 109 S.Ct. at 2953. Because "[t]he rule sought by [Smith] would neither decriminalize a class of conduct nor prohibit the imposition of capital punishment on a particular class of persons," he does not qualify for this exception. *Saffle,* — U.S. at ——, 110 S.Ct. at 1263.

The second exception is for those rare "watershed rules of criminal procedure" which implicate the fundamental fairness *and* accuracy of the criminal proceeding. *See Saffle,* — U.S. at ——, 110 S.Ct. at 1263; *Butler,* 110 S.Ct. at 1218. As the en banc court noted in *Sawyer v. Butler,* 881 F.2d 1273, 1294 (5th Cir.1989) (en banc), *aff'd, sub nom. Sawyer v. Smith,* — U.S. ——, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990), this exception is tailored to those rules designed to redress constitutional violations which "so distort the judicial process as to leave one with the impression that there has been no judicial determination at all, or else skew the actual evidence crucial to the trier of fact's disposition of the case," and does not include procedurally flawed contemplation or review of relevant evidence. As the Supreme Court recently observed in *Sawyer v. Smith.* "[a]ll of our Eighth Amendment jurisprudence concerning capital sentencing is directed toward the enhancement of reliability and accuracy in some sense," but *Teague*'s second exception is limited to "watershed"

rules affecting "bedrock procedural elements." —— U.S. at ——, 110 S.Ct. at 2831. The rule on which Smith would rely is not of such exalted stature.

Because we conclude that a necessary component of Smith's claim that the use of the "especially heinous" aggravating circumstances in his sentencing phase was barred by *Teague,* we do not consider whether that claim has been procedurally barred or has merit.

### G. *Discriminatory Use of Peremptory Challenges*

██ In the words of his habeas petition to federal district court, Smith contends that his

> [D]eath is being exacted pursuant to a pattern and practice of Mississippi prosecuting authorities, courts, juries and governors to discriminate on grounds of race, sex and poverty in the administration of capital punishment. For this reason, the imposition and execution of Petitioner's death sentence under Mississippi law and practice violates the eighth amendment and the equal protection and due process clauses of the fourteenth amendment to the Constitution of the United States.

The Mississippi Supreme Court held a substantially identical claim to be barred for failure to raise the claim at trial or on direct appeal, 500 So.2d at 974–76, and the federal district court agreed. 689 F.Supp. at 662–63.

Smith seeks to provide "cause" for his default by claiming he lacked the information regarding the practices of the particular prosecution office presented to the district court in *Edwards v. Thigpen,* 682 F.Supp. 1374 (S.D.Miss.1987), *aff'd sub nom. Edwards v. Scroggy,* 849 F.2d 204 (5th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1328, 103 L.Ed.2d 597 (1989). However, the proof offered in that case

was found to fall short of establishing a prima facie case, 849 F.2d at 208–09, and Smith does not allege additional facts warranting a different outcome in his case.[17] We agree with the courts below that Smith has procedurally defaulted on his claim. *See, e.g., Thomas v. Moore,* 866 F.2d 803 (5th Cir.) (failure to timely object to the jury selection process voids relief), *cert. denied,* —— U.S. ——, 110 S.Ct. 124, 107 L.Ed.2d 85 (1989). Moreover, because Smith's conviction became final before *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (per curiam), was decided, he is not in any event entitled to rely on its rule. *Allen v. Hardy,* 478 U.S. 255, 258–61, 106 S.Ct. 2878, 2879–81, 92 L.Ed.2d 199 (1986).

### H. *Validity of Mississippi's Procedural Bars*

██ Smith contends generally that "[n]either the contemporary objection rule nor the rule on assertion of claims on appeal has been consistently applied by Mississippi in capital cases," and that procedural default rules do not therefore preclude federal courts from reaching the merits of his claims. *See, e.g., Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988). As discussed previously, Smith is entitled to proceed on claims appropriately reserved by contemporaneous objection, notwithstanding the Mississippi rule. However, his clemency does not extend to claims raised neither at trial nor on direct appeal. *See Johnson v. Thigpen,* 623 F.Supp. 1121, 1127–28 (S.D.Miss. 1985), *aff'd,* 806 F.2d 1243 (5th Cir.1986), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1618, 94 L.Ed.2d 802 (1987). Smith's contention that the contemporaneous objection rule should also be ignored was recently, and for the purposes of this appeal, decisively rejected in *Hill v. Black,* 887 F.2d 513, 516–17 (5th Cir.1989).[18]

---

**17.** The state contends without contradiction that while petitioner Edwards had no blacks on his jury, Smith had three.

**18.** Because we decide that Smith's claim that the "especially heinous" aggravating circumstance is

unconstitutional to be precluded by *Teague, see supra,* section F, we do not separately consider his potentially distinct argument that Mississippi has not regularly enforced its procedural bars with regard to such claims.

## I. *Denial of an Evidentiary Hearing and Critical Discovery*

■ Smith argues that the district court erred in denying his "request for an evidentiary hearing and for pre-hearing discovery, including scientific testing of physical evidence and compulsory process to depose Gregg [Smith's trial counsel]." To the extent that this argument bears on the rape allegation and the ineffective assistance of counsel claim, it has already been discussed, and is without merit. Smith newly argues for DNA testing of the hair and/or semen in evidence, but does not provide a reasoned argument for overturning the district court's discretion in pursuit of what amounts to a new trial. *Cf. Daigre v. Maggio,* 705 F.2d at 787–88.

### III.

For the reasons stated above, we AFFIRM the judgment of the district court denying Smith's petition for a writ of habeas corpus.

AFFIRMED.